**Ronald BEHAGEN, Plaintiff–Appellee,**

**v.**

**AMATEUR BASKETBALL ASSOCIATION OF The UNITED STATES of America, and William Wall, Defendants–Appellants.**

No. 87–1730.

United States Court of Appeals, Tenth Circuit.

Aug. 28, 1989.

---

Matthew J. Iverson (Edward F. Ruberry, of Burditt, Bowles, Radzuis & Ruberry, Ltd., Chicago, Ill., Franklin E. Lynch, of Kruse & Lynch, P.C., and Lee R. Wills and Mary E. Walta, of Wills and Gorsuch Kirgis, Colorado Springs, Colo., with him, on the briefs), of Burditt, Bowles, Radzuis & Ruberry, Ltd., Chicago, Ill., for defendants-appellants.

Steven M. Schneebaum (Charles E. Talisman and Rachel A. Shub, of Patton, Boggs & Blow, Washington, D.C., with him, on the brief), of Patton, Boggs & Blow, Washington, D.C., for plaintiff-appellee.

Before LOGAN, SETH, and TACHA, Circuit Judges.

TACHA, Circuit Judge.

This is an appeal from a jury trial awarding the plaintiff, Ronald Behagen, treble damages under the federal antitrust laws as well as damages for the deprivation of liberty or property interests without due process of law. The defendants contend on various grounds that the jury verdicts should be overturned as a matter of law. We hold that the antitrust claim is barred by the express intent of Congress and that the due process claim is barred by a lack of governmental action. We reverse.

## I.

The Federation Internationale de Basketball Amateur (FIBA) is the international organization that governs amateur basketball in its member countries. The Amateur Basketball Association of the United States of America (ABA/USA) is the FIBA member organization from the United States. In order for an American to play basketball in amateur competition outside the United States, the player is required to qualify as an amateur by receiving an ABA/USA travel permit and a FIBA license.

For an American who has played professional basketball, the amateur qualification process is known as reinstatement or reintegration. A reinstated player's eligibility is still limited, however, in that the player may not qualify for a national team and therefore may not participate in competition such as the Olympic Games. During the time relevant to this case, FIBA published the following grounds for reinstatement: (1) the player had signed with a professional club prior to reaching age twenty-one and had withdrawn within the subsequent twelve-month period; (2) the player had withdrawn from professional competition in order to follow a recognized professional occupation and had been engaged in that occupation for at least one full year; or (3) the player suffered from a serious illness or was the victim of an incapacitating accident. In addition, FIBA had interpreted its regulations to forbid more than one reinstatement for any one player, although the parties here dispute the extent to which this no-second-reinstatement rule was known outside FIBA at that time.

The plaintiff, Ronald Behagen is a former collegiate All–American basketball player who went on to play professional basketball for several teams in the Nation-

al Basketball Association. In the fall of 1979, Behagen joined a basketball team in Siena, Italy. The Italian league in which Behagen played is considered by FIBA to be an amateur league, and Behagen was therefore required to obtain amateur qualification.[1] Behagen never applied to the ABA/USA for a travel permit, but was nevertheless issued a license by FIBA. After completion of the 1979–1980 season, Behagen returned home to Atlanta where he attended an Atlanta Hawks–Washington Bullets basketball game. Behagen was subsequently approached about playing the season's few remaining games for the Bullets, and he signed a contract to play in those games.

After concluding the season with the Bullets, Behagen returned to Italy and negotiated a contract with the Siena team for the 1980–1981 season. Although he played in a few preseason and exhibition games, again he failed to take action towards obtaining reinstatement by the ABA/USA. William Wall, the executive director of the ABA/USA, informed FIBA that Behagen had once again played professional basketball in the United States. Upon learning of Behagen's professional play, FIBA informed the Siena team that Behagen was ineligible under FIBA regulations. The team then informed Behagen that they would not honor his contract for the 1980–1981 season.

Behagen then contacted the ABA/USA and FIBA about his eligibility and was informed that FIBA had a policy against granting any player a second reinstatement. He was told that his only hope for an appeal was to contact Dr. Borislav Stankovic, the Secretary General of FIBA. Behagen met briefly with Stankovic in Rome, but the no-second-reinstatement rule was not changed.

Behagen brought suit against FIBA, the ABA/USA, and William Wall, seeking the following relief: 1) treble damages for violations of the federal antitrust laws; 2)

damages for tortious interference with contract; and 3) damages for the deprivation of liberty or property interests without due process of law. The federal district court dismissed FIBA as a party, granting summary judgment on a motion based on lack of personal jurisdiction. The Tenth Circuit reversed the lower court, finding that there were factual disputes material to the personal jurisdiction issue. *Behagen v. Amateur Basketball Ass'n of the United States*, 744 F.2d 731, 735 (10th Cir.1984), *cert. denied*, 471 U.S. 1010, 105 S.Ct. 1879, 85 L.Ed.2d 171 (1985).

Behagen and FIBA subsequently settled, but the remaining defendants proceeded to a jury trial. The jury rendered its verdict in favor of the defendants on the tortious interference with contract count, but in favor of the plaintiff on the antitrust and due process counts. The district court awarded attorneys' fees and costs to the plaintiff and denied the defendants' motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. The defendants then appealed the adverse judgment to this court.

## II.

When a trial in federal court is a trial to the jury, our review of the evidence is "limited to the inquiry as to whether the record contains substantial evidence to support the jury's ... conclusion, viewing the evidence in the light most favorable to the prevailing party." *Kitchens v. Bryan County Nat'l Bank*, 825 F.2d 248, 251 (10th Cir.1987). The trial court's legal conclusions, however, are subject to de novo review, *see United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 526, 81 S.Ct. 294, 297, 5 L.Ed.2d 268 (1961); *United States ex rel. Bergen v. Lawrence*, 848 F.2d 1502, 1505 (10th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 528, 102 L.Ed.2d 560 (1988), and therefore "[t]he appellate court is not bound by the trial

---

1. Although the Italian league was considered to be an amateur league, its players were paid for playing on its teams. Because of their amateur status, however, the Italian players did not lose eligibility for Olympic competition. This situation exists throughout Europe. Consequently, it is best to treat "amateur" and "professional" in this case as merely technical terms denoting a status for purposes of the international amateur athletic organizations.

court's conclusions of law," *State Distributors, Inc. v. Glenmore Distilleries Co.,* 738 F.2d 405, 412 (10th Cir.1984). This court's power to correct errors of law encompasses "those [errors] that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law. *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 501, 104 S.Ct. 1949, 1959, 80 L.Ed.2d 502 (1984).

## III.

The defendants first contend that the district court erred in permitting the antitrust issue to go to the jury. The plaintiff alleged that the defendants violated section 1 of the Sherman Antitrust Act (Sherman Act), 15 U.S.C. § 1,[2] by being "key participants in an illegal group boycott by FIBA, its member organizations, and the leagues governed thereby, of players who have played in the American professional basketball leagues more than once." The jury found that there was a combination, agreement, or conspiracy among the defendants and alleged coconspirators resulting in an unlawful restraint of trade or commerce. The jury further found that the plaintiff was injured in his business and property as a proximate result of the defendants' illegal acts, and that he sustained damages that were capable of reasonable ascertainment and not speculative or conjectural.

■ We agree with the defendants that the antitrust issue should not have gone to the jury. The defendants' actions in this case were clearly within the scope of activity directed by Congress, and were necessary to implement Congress' intent with regard to the governance of amateur athletics. We therefore hold that the defen-

dants' allegedly violative actions here are exempt from the coverage of the federal antitrust laws.

We begin our analysis by examining congressional action concerning, and the current governing structures for, American involvement in international amateur sports.[3] Central to these governing structures is the organizing of competition under the auspices of the International Olympic Committee (IOC). The IOC possesses the rights to, and governs the operation of, the Olympic Games. *Michels v. United States Olympic Comm.,* 741 F.2d 155, 156 (7th Cir.1984). Each nation must be represented by a national Olympic committee that is recognized by the IOC, and the national committees in turn recognize a national governing body (NGB) for each Olympic sport. *Id.*

Congress chartered the United States Olympic Committee (USOC) as a "private corporation[ ] established under Federal law," 36 U.S.C. § 1101. *See San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.,* 483 U.S. 522, 107 S.Ct. 2971, 2984, 97 L.Ed.2d 427 (1987); *Michels,* 741 F.2d at 157; 36 U.S.C. §§ 371, 383. The USOC was recognized by the IOC as the national Olympic committee of the United States. *Michels,* 741 F.2d at 156. Congress later enacted the Amateur Sports Act of 1978, 36 U.S.C. §§ 371–382b, 391–396, to rectify the factional nature of amateur sports organizations in this country at that time. *See San Francisco Arts & Athletics,* 107 S.Ct. at 2985.

Under the Amateur Sports Act, NGB's play a major role in the governance of international amateur athletic competition. *See* 36 U.S.C. §§ 391–396. "For any sport which is included on the program of the

---

**2.** Section 1 of the Sherman Act reads in relevant part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal...." 15 U.S.C. § 1.

**3.** In *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the Supreme Court formulated "the state action doctrine [which] allowed state legislatures to formally command that certain areas of commerce be exempt from the

provisions of the Sherman Act." *Lease Lights, Inc. v. Public Serv. Co.,* 849 F.2d 1330, 1332 (10th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 817, 102 L.Ed.2d 807 (1989). Although the present parties have averted to the application of the state action doctrine, such an analysis is plainly inapplicable here as there is no conceivable element of action by a state. We therefore focus upon congressional intention of exempting the defendants' activity from the federal antitrust laws.

Olympic Games or the Pan–American Games, the [USOC] is authorized to recognize as a national governing body an amateur sports organization which files an application and is eligible for such recognition...." *Id.* § 391(a). Furthermore, "[t]he [USOC] shall recognize only one national governing body for each sport for which an application is made and approved." *Id.* The NGB must satisfy a number of requirements, including the ability to "demonstrate[ ] that it is autonomous in the governance of its sport, in that it independently determines and controls all matters central to such governance, does not delegate such determination and control, and is free from outside restraint." *Id.* § 391(b)(4).

Congress has also established the relationship between an NGB and the international organization governing a particular amateur sport. The Act authorizes an NGB to "represent the United States in the appropriate international sports federation," *id.* § 393(1), and provides that an NGB may "not have eligibility criteria relating to amateur status which are more restrictive than those of the appropriate international sports federation," *id.* § 391(b)(12). In keeping with the Congress' schema of monolithic control for each sport, the Act provides that an NGB must "demonstrate[ ] that it is a member of no more than one international sports federation which governs a sport included on the program of the Olympic Games or the Pan–American Games." *Id.* § 391(b)(4). The Act also authorizes an NGB to "designate individuals and teams to represent the United States in international amateur athletic competition (other than the Olympic Games and the Pan–American Games) and certify, in accordance with applicable international rules, the amateur eligibility of such individuals and teams." *Id.* § 393(7).

The Act provides for ongoing review of the NGB by the USOC in order to ensure compliance with the Act. *Id.* § 394. In the event that an NGB is alleged to be not in compliance, the Act provides for a hearing mechanism by which certain persons or organizations can seek to compel an NGB to comply with the requirements of the Act, and for penalties of probation, revocation of recognition, or replacement of the NGB if the USOC finds that the NGB is not complying adequately with the statutory requirements. *Id.* § 395.

Here, Behagen has alleged antitrust violations by the ABA/USA—the NGB for basketball—and by its executive director. Although an NGB is a private actor,[4] the monolithic control exerted by an NGB over its amateur sport is a direct result of the congressional intent expressed in the Amateur Sports Act. In such a situation, we follow the Supreme Court's analysis in *Silver v. New York Stock Exch.*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), and focus on the degree to which the private action was necessary to implement the intent of Congress.

In *Silver*, the Court considered whether the New York Stock Exchange (Exchange) could be held liable under the Sherman Act for its directive to certain Exchange members, issued without notice or hearing, requiring that they remove private wire connections with a nonmember broker-dealer. *Id.* at 342-44, 83 S.Ct. at 1249-50. In holding that the Exchange's action was within the scope of the antitrust laws, the Court examined the Securities Exchange Act of 1934, the Act under which the Exchange regulated its members' transactions and relationships with nonmembers, stating:

> The Securities Exchange Act contains no express exemption from the antitrust laws or, for that matter, from any other statute. This means that any repealer of the antitrust laws must be discerned as a matter of implication, and "[i]t is a cardinal principle of construction that repeals by implication are not favored." *United*

---

**4.** We reach this conclusion based on our analysis of *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, 483 U.S. 522, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987). *See id.*, 107 S.Ct. at 2984-87 (holding that USOC is not governmental actor and that conduct and coordina-

tion of amateur sports not traditional governmental function). Our rationale for rejecting ABA/USA as a governmental actor is developed in greater detail in our due process discussion *infra.*

*States v. Borden Co.*, 308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181; *see Georgia v. Pennsylvania R. Co.*, 324 U.S. 439, 456–457, 65 S.Ct. 716, 725–726, 89 L.Ed. 1051; *California v. Federal Power Comm.*, 369 U.S. 482, 485, 82 S.Ct. 901, 903, 8 L.Ed.2d 54. Repeal is to be regarded as implied only if necessary to make the Securities Exchange Act work, and even then only to the minimum extent necessary.

*Silver*, 373 U.S. at 357, 83 S.Ct. at 1257. The *Silver* Court therefore considered both the policies behind the antitrust laws and the policy of exchange self-regulation embodied in the 1934 Act, concluding that congressional intent to exempt action from the federal antitrust laws should be implied only when necessary to implement the clear intent of Congress. *See id.* at 357, 361, 83 S.Ct. at 1257, 1259; *see also Gordon v. New York Stock Exch., Inc.*, 422 U.S. 659, 682, 95 S.Ct. 2598, 2611, 45 L.Ed.2d 463 (1975) (repeal of antitrust provisions implied only when plain repugnancy exists between antitrust and regulatory provisions).

Here, the Amateur Sports Act provides definite proof of a congressional intent to authorize the USOC to recognize one and only one NGB at any given time for any one sport. *See* 36 U.S.C. § 391(a). The Act also makes clear that Congress intended an NGB to exercise monolithic control over its particular amateur sport, including

coordinating with the appropriate international sports federation and controlling amateur eligibility for Americans that participate in that sport. *See id.* §§ 391(b)(4), 391(b)(12), 393(1), 393(7). Although the Amateur Sports Act does not contain an explicit statement exempting action taken under its direction from the federal antitrust laws, *compare id.* §§ 371–382b, 391–396 *with* 15 U.S.C. §§ 1291–1295 (express exemption of agreements covering telecasting of professional sports), we find that the directives of the Act make the intent of Congress sufficiently clear.[5] As the Supreme Court has stated, "The Amateur Sports Act was enacted 'to correct the disorganization and the serious factional disputes that seemed to plague amateur sports in the United States.'" *San Francisco Arts & Athletics*, 107 S.Ct. at 2985 (quoting H.R.Rep. No. 1627, 95th Cong., 2d Sess. 8, *reprinted in* 1978 U.S.Code Cong. & Admin.News 7478, 7482).

Behagen complains of exactly that action which the Act directs—the monolithic control of an amateur sport by the NGB for that sport and by the appropriate international sports federation of which the NGB is a member. This truth is underscored by the fact that the ABA/USA could not be authorized under the Act unless it maintained exactly that degree of control over its sport that Behagen here alleges as an antitrust violation. *See* 36 U.S.C.

---

**5.** Reliance upon congressional intent to exempt from antitrust activity has been utilized in another context involving private action, athletics, and antitrust. The Supreme Court has long held that professional baseball enjoys an exemption from federal antitrust liability. *See Flood v. Kuhn*, 407 U.S. 258, 269–74, 285, 92 S.Ct. 2099, 2105–08, 2113, 32 L.Ed.2d 728 (1972); *Toolson v. New York Yankees, Inc.*, 346 U.S. 356, 356–57, 74 S.Ct. 78, 78, 98 L.Ed. 64 (1953); *Federal Base Ball Club, Inc., v. National League of Professional Base Ball Clubs*, 259 U.S. 200, 208–09, 42 S.Ct. 465, 465–66, 66 L.Ed. 898 (1922). This exemption does not extend to other professional sports. *See Haywood v. National Basketball Ass'n*, 401 U.S. 1204, 1205, 91 S.Ct. 672, 673, 28 L.Ed.2d 206 (Douglas, Circuit Justice 1971) (basketball); *Radovich v. National Football League*, 352 U.S. 445, 451–52, 77 S.Ct. 390, 393–94, 1 L.Ed.2d 456 (1957) (football); *United States v. International Boxing Club, Inc.*, 348 U.S. 236, 242, 75 S.Ct. 259, 262, 99 L.Ed. 290

(1955). The baseball exemption has persisted, however, in the face of considerable judicial consternation, *see Flood*, 407 U.S. at 286, 92 S.Ct. at 2113 (Douglas, J., dissenting) (stating that *Federal Base Ball* "is a derelict in the stream of the law"); *Radovich*, 352 U.S. at 452, 77 S.Ct. at 394 (implying that *Federal Base Ball* and *Toolson* are "unrealistic, inconsistent, or illogical"), and that persistence is based on a theory that Congress has allowed the Court's antitrust exemption for baseball to continue despite the Court's repeated statements that, if the baseball exemption is to be overruled, it is the place of Congress to do it. *See Flood*, 407 U.S. at 283–84, 92 S.Ct. at 2112; *Toolson*, 346 U.S. at 357, 74 S.Ct. at 78.

When, as here, we find a clear indication of the intent of Congress from the statute itself, rather than from Congress' acquiescence through inaction in the face of judicial construction, we find an even stronger case for inferring an antitrust exemption.

§ 391(b)(4). We hold that the defendants' actions were necessary to implement the clear intent of Congress, and therefore are exempt from the federal antitrust laws. Consequently, we reverse the district court's judgment on the antitrust issue.

## IV.

The defendants also contend that the district court erred in permitting the plaintiff's due process claim to go to the jury. The crux of the plaintiff's allegation was that the defendants "had denied him the right to earn a living in his chosen occupation without any form of adequate hearing, based on rules and standards that had no rational basis, that were not published, and that were selectively and inconsistently applied." The jury found that the defendants' acts constituted "state action," that the defendants' acts or failure to act as required caused the plaintiff to be denied a "property right" or a "liberty right," and that the plaintiff was deprived of such a right without "due process of law."

The due process clause of the fifth amendment provides that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. It is axiomatic that the fifth amendment applies to and restricts "only the Federal Government and not private persons." *Public Utils. Comm'n v. Pollak*, 343 U.S. 451, 461, 72 S.Ct. 813, 820, 96 L.Ed. 1068 (1952). Accordingly, in situations of purely private conduct, the Constitution provides no due process protection, "no matter how unfair that conduct may be." *National Collegiate Athletic Ass'n v. Tarkanian*, — U.S. —, 109 S.Ct. 454, 461, 102 L.Ed.2d 469 (1988) (applying due process clause of the fourteenth amendment). However, as this court has noted:

> The Supreme Court has approached the concept of governmental action flexibly. It has pragmatically examined ostensibly private activities to determine if they constitute governmental action. In this regard, the Court has inquired whether a private party is performing a "public function," *see Terry v. Adams*,

345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); *Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), or acting under "state compulsion," *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), whether there is a "nexus," *see Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), or "joint action" between the private party and the government, *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982); *Flagg Brothers v. Brooks*, 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978).

> These cases, taken together, impart at least two important principles. First, they recognize that power entrusted to the government by the people can ultimately be exercised through nominally private entities, be it through the government's delegation, compulsion, concerted action, or acquiescence. Second, they provide that when these nominally private parties exercise governmental power, they shall not exercise it insulated from constitutional constraints.

> The problem remains in distinguishing the exercise of governmental power from benign or tangential governmental involvement. This problem is resolved by "sifting facts and weighing circumstances" in each case. *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961).

*Gilmore v. Salt Lake Community Action Program*, 710 F.2d 632, 635–36 (10th Cir. 1983).

■ Defendant ABA/USA is at least a nominally private party. It is further removed from congressional action under the Amateur Sports Act than is the USOC. ABA/USA operates as an NGB only because of its recognition by the USOC. The Supreme Court, furthermore, has declared that "[t]he USOC is a 'private corporatio[n] established under Federal law.'" *San Francisco Arts & Athletics*, 107 S.Ct. at 2984 (quoting 36 U.S.C. § 1101(46)).

Behagen, however, contends that ABA/USA is a governmental actor because it undertakes to be the exclusive licensing authority for a particular profession—a function that Behagen claims is a traditional governmental function—and because Congress, by operation of the Amateur Sports Act, has bestowed upon the ABA/USA exclusive powers as an NGB.

Our analysis here is simplified by the pronouncements of the Supreme Court in *San Francisco Arts & Athletics*, which presented the Court with the issue of whether the USOC was a governmental actor under the Amateur Sports Act. *See* 107 S.Ct. at 2984–87. The Court there held that the USOC was not "a governmental actor to whom the prohibitions of the Constitution apply." *Id.* at 2984, 2986–87. In so holding, the Court rejected as bases for governmental action the congressionally-granted charter of the USOC, the regulation of the USOC by Congress, the granting to the USOC of the exclusive use of the word "Olympic," and any attempts on the part of Congress to help the USOC receive funding. *See id.* at 2985. Turning to arguments that the USOC became a governmental actor by fulfilling a traditional governmental function, the Court rejected that contention as well. *See id.* "The fact '[t]hat a private entity performs a function which serves the public does not make its acts [governmental] action,'" *id.* (quoting *Rendell–Baker v. Kohn,* 457 U.S. 830, 842, 102 S.Ct. 2764, 2772, 73 L.Ed.2d 418 (1982)). The Court concluded that the Amateur Sports Act "merely authorized the USOC to coordinate activities that always have been performed by private entities," *id.,* for "[n]either the conduct nor the coordination of amateur sports has been a traditional governmental function," *id.*

Proceeding from this certain ground that the USOC is not a governmental actor, it follows a fortiori that the ABA/USA is also not a governmental actor. Congress has conferred no authority upon the ABA/USA except that authorized because of its recognition as an NGB. Such recognition by statute must come through the USOC. If the Amateur Sports Act has not created a governmental actor in the USOC, it most

certainly has not done so in the ABA/USA, and, as we have observed, the Supreme Court has rejected governmental chartering, regulation, grants, or subsidies as bases for governmental action by the USOC. *See id.*

*San Francisco Arts & Athletics* also removes any grounds for finding the ABA/USA to be a governmental actor under a traditional governmental function rationale. Even if European basketball leagues persist in labeling their paid-for-play basketball teams as "amateur," that does not negate the fact that the ABA/USA has licensing power over play in those leagues by Americans only because Congress desired a monolithic control of amateur sports, and directed that amateur eligibility be governed by the NGB's, which operate under the aegis of the USOC. Further, as we have noted, the Supreme Court has held that such coordination and control of amateur sports is not a "traditional governmental function." *Id.* We hold that the ABA/USA is not a governmental actor to whom the due process prohibitions of the Constitution apply. Consequently, as a matter of law we reject the jury finding of "state action" in this case, and we conclude that the due process issue should never have gone to the jury. We therefore reverse the district court's judgment on the due process issue.

Finally, we note that our analysis here was not unanticipated by Congress and appears to be clearly within its intent. Congress debated provisions intended to ensure a federal cause of action for due process violations involving institutions under the Amateur Sports Act, and Congress rejected any such provisions. This court has previously noted the following observations of the Seventh Circuit:

"The legislative history of the [Amateur Sports] Act clearly reveals that Congress intended not to create a private cause of action under the Act. The Act as originally proposed contained an 'Amateur Athlete's Bill of Rights,' which included a civil cause of action in federal district court for any athlete against an NGB, educational institution, or other

sports organization that threatened to deny the athlete's right to participate in certain events. *See* S. 2036, 94th Cong., 1st Sess. § 304(a) (1977). As the Senate Report explains, this bill of rights provision 'met with strong resistance by the high school and college communities. Ultimately, the compromise reached was that certain substantive provisions on athletes' rights would be included in the USOC Constitution, and not in the bill.' S.Rep. No. 770, 95th Cong., 2d Sess. 5–6 (1978). Congress omitted the bill of rights provision in the Act's final version. Congress thus considered and rejected a cause of action for athletes to enforce the Act's provisions."

*Martinez v. United States Olympic Comm.*, 802 F.2d 1275, 1281 (10th Cir.1986) (quoting *Michels*, 741 F.2d at 157–58). It is not without reason that the coordination and control of amateur sports has not been a traditional governmental function. *See Michels*, 741 F.2d at 159 (Posner, J., concurring) ("Any doubt on this score can be dispelled by the reflection that there can be few less suitable bodies than the federal courts for determining the eligibility, or the procedures for determining the eligibility, of athletes to participate in the Olympic Games.").

### V.

We reverse the judgment of the district court on the antitrust issue because of the clear intent of Congress to exempt the defendants' actions here from the federal antitrust laws. We reverse the district court's judgment on the due process issue, for want of the requisite governmental action. REVERSED.