UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 98-11102

_____

ELEVEN LINE, INC., d/b/a
PERMIAN BASIN SPORTS CENTER,

Plaintiff-Appellee,

versus

NORTH TEXAS STATE SOCCER
ASSOCIATION, INC., A TEXAS
NON-PROFIT CORPORATION,
MIDLAND SOCCER ASSOCIATION,
INC., A TEXAS NON-PROFIT
CORPORATION, AND ODESSA
SOCCER ASSOCIATION, INC., A
TEXAS NON-PROFIT CORPORATION,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Texas

_____

May 26, 2000

Before DAVIS and JONES, Circuit Judges, and LEMELLE,[*] District
Judge.

EDITH H. JONES, Circuit Judge:

This case concerns allegedly exclusionary, anti-
competitive conduct by non-profit volunteer-run soccer
organizations against a for-profit indoor soccer facility that
operated in the Midland-Odessa community of West Texas.  A jury

_____

[*]    District Judge of the Eastern District of Louisiana, sitting by
designation.

found that the organizations' implementation of a membership rule requiring players, coaches and referees to play soccer only at "sanctioned" facilities essentially put the plaintiff, Eleven Line, Inc., out of business. Several federal antitrust and state law causes of action were sustained by the jury, and judgment was rendered for $100,000 in lost profits before trebling. The court enjoined enforcement of the unsanctioned play rule.

On appeal, North Texas State Soccer Association ("NTSSA") seeks a defense in the Amateur Sports Act, a law passed by Congress to enhance this country's competitiveness in the Olympics by eliminating organizational factionalism in amateur sports. See H.R. Rep. 95-1627, 95th Cong., 2d Sess. 1978, 1978 U.S.C.C.A.N. 7478 (hereinafter "H.R. Rep."). Failing that, NTSSA questions every significant aspect of the verdict on the Sherman Act § 1 and § 2 claims and the Texas tortious interference claims. NTSSA also challenges the sufficiency of Eleven Line's proof of damages. Although a number of issues raised by NTSSA cast doubt on the judgment, we ultimately conclude that Eleven Line failed to show that it suffered compensable damages resulting from NTSSA's conduct.

## I.   BACKGROUND

Tom Higginson, San Diego-based president of Eleven Line, Inc., parlayed his lifelong love of soccer into several ventures, including a string of indoor soccer arenas in various parts of the

2

country.  In 1990, Higginson opened The Permian Basin Sports Center ("PBSC"), an indoor arena in Midland, in a building formerly occupied by an 84 Lumber discount home improvement warehouse.[1] Higginson bought the building and its parking lot after a four or five-day visit to Midland-Odessa.  He became persuaded, by attending one semi-pro soccer game, visiting a small indoor arena already in business there, and talking with local soccer enthusiasts, that the Midland-Odessa area would welcome a bigger and better indoor soccer arena.[2]

PBSC's operation was modeled on Higginson's other indoor arenas.  Most of his youth customers were outdoor soccer players, ranging from youth six years old to nineteen, who wanted to maintain their skills during the winter and summer off-seasons for outdoor soccer.  The adult leagues ran year-round.  PBSC ran leagues of a minimum of four teams, grouped according to age or skill level.  Each team consisted of about 10 players, fewer than an outdoor soccer team because the arenas are smaller.  PBSC furnished player ID cards, maintained league standings, ran competitions, disciplined players, and coordinated with other Higginson-run facilities on interstate tournaments. While PBSC did not formally train referees, it required them to pass a written

---

[1]     Eleven Line, Inc., is the corporate successor of another Higginson-owned company that actually managed PBSC for several years.  Because the corporate identity is immaterial to this opinion, we refer to the plaintiff as PBSC throughout.

[2]     After PBSC entered the market, the other indoor arena folded.

qualifying test. For officiating services, the facility drew from its managers and from the more numerous pool of referees trained by the NTSSA-affiliated organizations. The arena similarly depended on coaches from the outdoor teams to organize teams of youth interested in continuing playing during the off-seasons.[3] But PBSC would also form teams of players who signed up singly at its facility.

The arena charged $350 per team for each eight-game session. The teams paid small separate fees to the scorekeeper and one referee at each game. PBSC earned additional revenues from snack and drink sales and private rentals of the facility. Players were not insured at PBSC, which required a waiver of liability from each of its customers.

Higginson chose not to join NTSSA as a "sanctioned" facility because he disagreed with some of the organization's rules and felt that NTSSA would raise his costs and interfere with his management prerogatives.[4]

The arena's business lurched along for five years, but its annual gross revenue peaked at $108,000 in 1991. Higginson or his investors transfused capital into the business nearly every

---

[3] Many members of outdoor teams either decided to rest through the off-season or to participate in other sports and leisure and extra-curricular activities.

[4] To become a sanctioned arena, PBSC would have to pay a nominal fee ($25) to NTSSA each year and would have to purchase and charge NTSSA-registered players about $12 for ID cards, remitting part of the charge to NTSSA for player insurance and NTSSA's overhead.

year.  Nevertheless, the company periodically fell behind in its payroll and property taxes.  In 1995, because of insufficient revenue and a manager "who was not very good at depositing [revenue] in our account," Higginson closed the arena from June through October.  Events surrounding the ill-fated re-opening of the facility in November 1995 are the basis for this lawsuit.

PBSC's business potential was directly attributable to the growing popularity of organized soccer in Midland-Odessa. Making inroads into a locality saturated by the American football ethos, the Midland ("MSA") and Odessa ("OSA") soccer associations' enrollment grew from about 2,700 in 1990 to over 4,500 registered players at the date of trial in early 1998.[5]  The success of outdoor soccer resulted from thousands of hours' effort by unpaid volunteers, many of whom began as soccer moms and dads seeking a sports activity for their children.  The volunteers ran the MSA and OSA literally from the ground up, building soccer fields in the hard west Texas caleche soil, coordinating the league, training players, coaches and referees, fund raising, and disciplining players.  Neither organization had more than one full-time paid employee during the period covered by the lawsuit.  MSA and OSA ran the only significant youth soccer programs in their respective communities.

---

[5]  OSA's official history reports that there were 700 registered players in 1990, and Barbara K. Peterson testified to the number registered at time of trial.  In Midland, Connie Stahl testified, there were over 3,000 registered players at the date of trial.

MSA and OSA are members of the North Texas State Soccer Association, also a volunteer-run, non-profit corporation, which is a "national state association" member of the United States Soccer Federation ("USSF"). USSF, the national governing body for the sport of soccer, oversees United States participation in the Olympic games pursuant to the Amateur Sports Act of 1978. Its work is carried out by 55 national state associations (Texas, like a couple of other large states, being subdivided into two such organizations). NTSSA is the fifth largest national state association, and it has the largest adult registration among the USSF's members. The USSF prescribes rules of soccer, determines qualifications for coaches and referees, and oversees the operations of the national state associations. It has the obligation to approve the local rules of national state associations and may enact eligibility standards for players. The overriding purpose of these organizations is to encourage the game of soccer, promoting its popularity as a recreational and competitive sport and enhancing the skills, safety and sportsmanship of the participants.

Notwithstanding the lofty goals of the volunteer soccer organizations, PBSC alleged that their attempted hegemony over the sport fatally wounded its business.

NTSSA passed an eligibility rule in the 1980's, which stated that:

3.2 Youth and amateur players or teams who participate with unregistered players or engage in unsanctioned play shall void their NTSSA registration and must apply for reinstatement to their appropriate Youth or Amateur Commissioner, along with a refiling fee of $2 per player.

3.2.1.  Unsanctioned play shall include, but not be limited to:

1.  Outdoor/indoor league not sanctioned by NTSSA or another USSF affiliate.

2.  Outdoor/indoor tournament not sanctioned by NTSSA or another USSF affiliate.

3.  Any game (friendly or scrimmage) with a non-USSF affiliate.

This is the "unsanctioned play" rule, and it was reviewed and approved by USSF according to USSF's regulations.

The local organizations were paid registration fees by each player for each season, spring and fall, a portion of which was remitted to NTSSA for player insurance and NTSSA's overhead costs. During PBSC's existence, the fee was $35 per player per season, and NTSSA's share of that was $8, half of which paid for insurance. For indoor soccer in NTSSA-sanctioned facilities, NTSSA received revenue from player ID cards.

In early 1995, a newly-elected president of the Midland Soccer Association says he decided it was time to align local practices more closely with NTSSA rules. He began discussing the unsanctioned play rule with NTSSA's indoor commissioner and brought the subject up at MSA's board meetings. If the unsanctioned play rule were enforced, MSA players and coaches could not utilize PBSC,

7

an unsanctioned facility.  No action was taken to enforce the unsanctioned play rule, however, because PBSC voluntarily shut its doors in June of that year.  The facility was not expected to re-open.

The unsanctioned play rule went right back on MSA's board meeting agenda in November, 1995, however, shortly after Troy Skinner arrived in Midland as Higginson's manager to reopen PBSC. Troy had begun calling coaches and players who had previously patronized the arena, soliciting their business for an immediately impending winter season.  The MSA board discussed the application of the unsanctioned play rule to players, coaches and referees who might consider returning to PBSC.  A rumor spread that anyone who played at PBSC without authorization would be suspended from NTSSA soccer for a year.  Meanwhile, at the OSA, the coaches' coordinator distributed a letter reporting a controversy surrounding unsanctioned play and the filing of a lawsuit by PBSC (on December 19, 1995), and recommending that OSA members should not play there until the dust settled.

Within a month, NTSSA board members were discussing the unsanctioned play rule at their meeting.[6]  NTSSA's president David Messersmith sent a letter to both the MSA and OSA in early December, advising board members and any other local administrators who were asked about the unsanctioned play rule simply to quote or

---

[6]     On November 22, 1995, PBSC's attorney sent a letter demanding that NTSSA not enforce the unsanctioned play rule.

8

read the rule. This was the "only appropriate response[s]" to such inquiries.

Confusion persisted. Nearly all of the MSA, OSA and NTSSA Board members testified that they did not publicize Messersmith's letter or direct any players or coaches not to play at PBSC. No one testified that the unsanctioned play rule was actually enforced against anyone, and the soccer board members uniformly testified that before it could be enforced, a formal complaint would have to be brought against an alleged violator, and a hearing <u>must be</u> held. No such complaints or hearings materialized.[7] But the horse was out of the barn, because the Messersmith letter was posted at the OSA offices, the Odessa coaches' coordinator sent out his interpretation of the events on OSA stationery, and the potential applicability of the unsanctioned play rule was made known. Several coaches from Midland and Odessa testified that they were reluctant to allow their teams to play at PBSC and to jeopardize their standing for future outdoor soccer competition.

PBSC's business declined precipitously. Instead of the 105 youth and adult teams that had been registered for the 1994-95 winter season, only 43 signed up for 1995-96. Within six months,

---

[7] The record does contain a half dozen or so letters from soccer players or their parents, attaching requests for "reinstatement" together with the $2 refiling fee. There is no evidence that any player was denied permission to play on account of not paying the refiling fee.

PBSC had closed for good, and Higginson sold the facility. The lawsuit continued.

When this case came to trial, PBSC contended that NTSSA, MSA and OSA were one entity running organized soccer in North Texas and that this entity conspired with the players, coaches and referees to "enforce" the unsanctioned play rule and prevent PBSC from obtaining business at its unsanctioned facility. Whether the eligibility rule effected a per se federal antitrust violation or not, it was alleged to constitute a vertical restraint imposed by the soccer organizations on their members/consumers that unreasonably restrained trade by depriving the soccer players of the opportunity to play at unsanctioned facilities.[8] PBSC also contended that the soccer organizations form a monopoly that used its market power to exclude "competitors" like PBSC from the market for soccer in the Midland-Odessa area. PBSC contended its damages consisted of discounted lost cash flow for a ten-year period projected forward from 1995.

NTSSA defended the unsanctioned play rule as a device originally intended (1) to deter fraudulent or mistaken insurance claims on the policy that covers players, (2) to maintain uniform discipline over the players, and (3) to control the quality and safety of facilities. Although the court denied NTSSA's motion for

---

[8] PBSC also alleged tortious interference with contract and business relations claims dependent on the finding of antitrust violations, which would vitiate defendants' right to rely upon the unsanctioned play rule.

10

summary judgment based on an implied antitrust exemption created by the Amateur Sports Act, the defendants were permitted to explain that the national state associations' rules were subject to express approval by the U.S. Soccer Federation. Defense witnesses discussed the benefits of their organization's oversight of indoor arenas where thousands of NTSSA-registered players compete in the off-seasons. Defense witnesses also asserted that none of the organizations had directly enforced the unsanctioned play rule, that no complaints were brought to enforce the rule, and that they never sought to identify who played at the PBSC. Finally, they emphasized that their organizations would reap at best a minuscule financial benefit from the closing of PBSC.

The jury found the soccer organizations guilty of a Sherman Act § 1 conspiracy to perpetrate an unreasonable restraint of trade, § 2 illegal monopolization and "leveraging," and state tortious interference claims.[9] The jury awarded most of the damages sought by PBSC.

This appeal will address several of the significant issues raised by NTSSA.

---

[9] The court first entered judgment on the verdict finding a per se § 1 violation, but on reconsideration, he wisely chose the alternate ground of an unreasonable restraint of trade. See, e.g. Nat'l Soc'y of Prof'l Engineers v. United States, 435 U.S. 679, 691, 98 S.Ct. 1355, 1365 (1978).

## II.  AMATEUR SPORTS ACT

Congress passed the Amateur Sports Act ("ASA"), 36 U.S.C. § 220501 *et seq.*, in 1978, creating a vertical structure for the management of certain amateur sports in the United States.[10]  See 36 U.S.C. § 220503; H.R. Rep.  At the head of this vertical structure is the U.S. Olympic Committee, which Congress intended as a coordinating body for amateur sports that Americans compete in internationally.  See H.R. Rep..  At the next level are National Governing Bodies ("NGBs") for each sport included in the Olympic Games or the Pan-American Games.  See 36 U.S.C. § 220521.

The NGBs are crucial to carrying out the ASA's purpose. In order to be recognized as a NGB, a sports organization must demonstrate autonomy in the governance of its sport – it must "independently decide[] and control[] all matters central to governance;" "not delegate decision-making and control of matters central to governance;" and be "free from outside restraint."  See 36 U.S.C. § 220522(a)(5).  Once established, a NGB has broad authority.  In addition to other powers, it may establish national goals for the sport, act as the coordinating body for amateur athletic activity in the United States, conduct amateur athletic

---

[10]    Congress wished to address the disorganization and factionalism of amateur sports organizations in the United States, a disorganization which it felt had contributed to the overall decline of American achievement in international competition.  See H.R. Rep.; <u>Behagen v. Amateur Basketball Ass'n of the United States</u>, 884 F.2d 524, 527 (10th Cir. 1989).

12

competition and establish procedures for determining eligibility standards.  See 36 U.S.C. § 220523.  In addition, it is responsible for tasks like developing interest and participation in the sport, minimizing scheduling conflicts through coordination, and disseminating information.  *See* 36 U.S.C. § 220524.

Appellants argue that the ASA exempts from the federal antitrust laws their actions in promulgating and threatening enforcement of the unsanctioned play rule.  They base their argument on Behagen v. Amateur Basketball Ass'n of the United States, 884 F.2d 524, 529-30 (10th Cir. 1989).  In that case, the Tenth Circuit held that, in passing the ASA, Congress intended for NGBs to exercise monolithic control over a particular sport, and NGBs could exercise such control without fear of violating the federal antitrust laws.  Id.

To be sure, Congress did not expressly exempt action taken under the ASA's direction from the federal antitrust laws. See Behagen, 884 F.2d at 529.  An ASA exemption must be implied, and implied exemptions are not favored.  See Silver v. New York Stock Exchange, 373 U.S. 341, 357, 83 S.Ct. 1246, 1257 (1963).  A court should only find an implied antitrust exemption where it is necessary to the operation of another statutory scheme, and then only to the minimum extent necessary.  See id.

Despite the narrow range of implied exemptions, Behagen extrapolated from the ASA's purpose and structure that Congress

13

intended that action taken under its direction be exempt from the federal antitrust laws. See Behagen, 884 F.2d at 529. Like PBSC here, Behagen complained of an alleged group boycott. See Behagen, 884 F.2d at 527. He alleged that the amateur eligibility rules of the international basketball association, Federation Internationale de Basketball Amateur ("FIBA"), and the U.S. NGB for basketball, the Amateur Basketball Association of the United States ("ABA/USA"), effected an illegal group boycott of players like him who had played American professional basketball more than once. See Behagen, 884 F.2d at 525-26. The Tenth Circuit rejected his claim after concluding that the ABA/USA, as the NGB for basketball, could promulgate amateur eligibility rules exempt from the application of the federal antitrust laws. See Behagen, 884 F.2d at 528.

This Court believes Behagen was correctly decided; but it does not cover the case at bar. Behagen sued the NGB itself for its action taken pursuant to its rule about player eligibility. In this case, however, USSF[11] neither issued the NTSSA unsanctioned play rule nor explicitly approved it. In fact, NTSSA is USSF's only national state association to have such a rule, which suggests that the rule is not necessary to the local management of amateur soccer. Appellants argue that USSF's rule requiring that USSF review the original and any amendments of the charter, bylaws,

---

[11]     USSF is the NGB for soccer.

rules and regulations of a national state association mean that USSF has effectively endorsed the unsanctioned play rule. See USSF Official Administrative Rule Book, R. 2011 § 2 (1996-1997). This Court is not persuaded; the supposed approval is simply too tenuous.

Although the facts of this case do not support an implied exemption from the antitrust laws, an implied exemption would be appropriate in many other situations. For example, if national state associations all over the country had a similar rule, one could infer that the rule was necessary to the management of the sport. If NTSSA's insurers had required that it have such a rule, then its existence would be necessary to the continued successful operation of amateur soccer in the area. If USSF had promulgated the rule or expressly approved NTSSA's rule in such a way as to indicate an awareness of its consequences, it would be a player eligibility rule exempted under Behagen. Or if NTSSA faced a spate of facilities that refused to become sanctioned facilities, NTSSA could face a freeriding problem that would threaten its effectiveness as a national state association. Any of these circumstances, and no doubt others not described here, would merit an implied exemption.

None of these situations present themselves, however. Rather, NTSSA promulgated a rule that could be found nowhere else in the country, that was not explicitly approved by the USSF, and for which it was unable to articulate a convincing rationale

15

related to its management of amateur soccer in the area.  Given these factors, the ASA does not exempt the NTSSA from antitrust scrutiny related to the unsanctioned play rule.[12]

### III.  ANTITRUST CLAIMS

For reasons other than the impact of the Amateur Sports Act, the jury's findings rendered this a most unusual antitrust case.  First, the conspirators include, on one hand, the defendant soccer organizations, and, on the other hand, the moms and dads who serve as coaches and referees for the youthful players.  Second, treating the soccer organizations as a monopolist seems to make little sense because of the minimal gains they could claim by eliminating PBSC from the Midland-Odessa market.  After an exhaustive search of antitrust law pertaining to league sports, we have been unable to identify any really analogous case.[13]  The unique feature of this case, which pervades the issues of conspiracy and monopoly, is the involvement of defendants and conspirators none of whom has an economic motive for

---

[12]    For similar reasons, PBSC's state law actions are not preempted by the ASA.  The ASA has not totally occupied the field, and the state law actions are not inconsistent with the ASA's statutory scheme.

[13]    See, e.g., Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 105 S.Ct. 2847 (1985); NCAA v. Bd. of Regents of the Univ. of Okla., 468 U.S. 85, 104 S.Ct. 2948 (1984); Chicago Prof'l. Sports, Ltd. v. NBA, 95 F.3d 593 (7th Cir. 1996); McCormack v. NCAA, 845 F.2d 1338 (5th Cir. 1988); United States Trotting Ass'n v. Chicago Downs Ass'n, Inc., 665 F.2d 781 (7th Cir. 1981); Hatley v. Am. Quarter Horse Ass'n., 552 F.2d 646 (5th Cir. 1977); Bridge Corp. of America v. Am. Contract Bridge League, Inc., 428 F.2d 1365 (9th Cir. 1970); Washington State Bowling Proprietors Ass'n v. Pacific Lanes, Inc., 356 F.2d 371 (9th Cir. 1966); Seabury Mgmt., Inc. v. Prof'l Golfers' Ass'n of Am., Inc., 878 F. Supp. 771 (D.Md. 1994), aff'd in part & rev'd in part, 52 F.3d 322 (4th Cir. 1995), cert. denied, 516 U.S. 867, 116 S.Ct. 184 (1995); Medlin v. Prof'l Rodeo Cowboys Ass'n., Inc., 1991 WL 340303 (D.Colo. 1991).

16

anticompetitive activity because none participates in soccer for profit.

It appears to be a novel claim by PBSC that a volunteer sports league can conspire with its volunteer players and coaches. In a for-profit league, no similar conspiracy could exist because the coaches and players are employees of the league or its teams. See Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 769, 104 S.Ct. 2731, 2741 (1984). Similarly, Copperweld renders infeasible any claim of conspiracy among NTSSA, MSA, and OSA, which function jointly as one entity under the auspices of USSF. Id. There are no organized teams within the league that could be identified as co-conspirators. This situation leaves as the only possible co-conspirators the moms and dads, since their children who play soccer are too young to conspire. Moms and dads are acting independently of the soccer organizations, but inasmuch as they are not economically motivated, it is difficult to conclude that they are more like joint venturers than a functional entity as contemplated by Copperweld. Copperweld, 467 U.S. at 768, 104 S.Ct. at 274. Whether moms and dads can conspire with NTSSA, MSA, and OSA decides whether section 1 of the Sherman Act, proscribing a "conspiracy" in restraint of trade, applies to their conduct. The nature of the concerted action does not, however, remove the defendants' conduct from the purview of section 2 if they are monopolizing.

17

But therein lies another rub. These soccer organizations had no economic motive for violating the monopolization prohibitions of the antitrust laws. No evidence suggested that MSA or OSA would gain a single dollar by eliminating PBSC from the market, while the maximum revenue that NTSSA might earn from exclusion was paltry.[14] Contrary to the economic theory of monopolistic conduct, none of the defendants had a motive to increase prices or limit output of soccer. The development of the sport, to which the organizations are committed, depends on increasing player participation, creating more teams and offering more soccer games. The organizations' fees are kept in check internally because the volunteers who are also consumers of the services set their own fees. In a relevant market that consisted of soccer alone, the defendant organizations may have been a functional monopolist, but they gained only minimal value by eliminating PBSC. It is true that the Supreme Court has exempted neither the NCAA, for-profit sports leagues (apart from baseball), or professional associations from the reach of antitrust laws.[15]

---

[14] NTSSA received a $25 annual fee from each sanctioned indoor soccer facility and could earn, at most, a few thousand dollars (net of insurance costs) from player registrations at an indoor arena like PBSC. Presumably, NTSSA did earn some small sums after PBSC closed, because a sanctioned indoor facility, Sticks and Kicks, took the place of PBSC in the market.

[15] FTC v. Indiana Fed. of Dentists, 476 U.S. 447, 106 S.Ct. 2009 (1986); NCAA v. Bd. of Regents, 468 U.S. 85, 104 S.Ct. 2948 (1984); Arizona v. Maricopa County Med. Soc., 457 U.S. 332, 102 S.Ct. 2466 (1982); National Soc'y of Prof'l Engineers v. United States, 435 U.S. 679, 98 S.Ct. 1355 (1978).

18

In none of those cases, however, was there such a complete absence of evidence of profit incentives as in this case.

Although this case poses ponderous and unusual antitrust questions, which may not have been fully explored below because of the limited resources available to both sides, we note them to preserve the issues for a future day. For even if affirmance of the judgment of liability is compelled by antitrust law,[16] the judgment for damages is not, and the deficiencies of the damage judgment are much easier to explain.

## IV. DAMAGES

The general principles governing antitrust damages are settled. A plaintiff must first prove the fact of antitrust damages, some "element of actual damages caused by the defendant's violation of the antitrust laws." Multiflex, Inc. v. Samuel Moore & Co., 709 F.2d 980, 989 (5th Cir. 1983), cert. denied, 104 S.Ct.

---

[16] We decline to endorse and do not rule on the district court's application of a § 2 "monopolistic leveraging" theory of liability. This theory, based on Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 275 (2d Cir. 1979), cert. denied, 444 U.S. 1093 (1980), is the subject of a circuit split. See M & M Medical Supplies and Service, Inc. v. Pleasant Valley Hosp., Inc., 981 F.2d 160, 168-69 (4th Cir. 1992) (en banc), cert. denied, 508 U.S. 972, 113 S.Ct. 2962, 125 L.Ed.2d 662 (1993) (declining to determine whether there exists a claim for monopoly leveraging that differs materially from the classic claim for monopolization); Fineman v. Armstrong World Industries, Inc., 980 F.2d 171, 204-06 (3d Cir. 1992), cert. denied. 507 U.S. 921, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993) (rejecting monopoly leveraging); Alaska Airlines, Inc. v. United Airlines, Inc., 948 F.2d 536, 547 n.16 (9th Cir. 1991), cert. denied, 503 U.S. 977, 112 S.Ct. 1603, 118 L.Ed.2d 316 (1992) (rejecting monopoly leveraging). In addition to the leveraging theory, the district court's judgment rested on § 2 monopolization and attempt to monopolize claims, which is affected by our refusal to endorse the leverating theory  Because the jury instructions regarding § 2 violation allowed the jury to find a violation if the defendants used their monopoly power "to gain a competitive advantage" even if the defendants did not attempt to monopolize the second market, the jury's verdict regarding the § 2 violation is completely tainted and must be overturned.

19

1594 (1984). If he does so, a more relaxed burden of proof obtains for the amount of damages than would justify an award in other civil cases. See Pierce v. Ramsey Winch Co., 753 F.2d 416, 434 (5th Cir. 1985). "But this tolerant view is limited by our responsibility not to allow damages to be determined by 'guesswork' or 'speculation;' we must at least insist upon a 'just and reasonable estimate of the damage based on relevant data.' Lehrman v. Gulf Oil Corp., 464 F.2d 26, 46 (5th Cir. 1972) (quoting Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264, 66 S.Ct. 574, 580 (1946)), cert. denied 409 U.S. 1077, 93 S.Ct. 687 (1972).

While the two most common methods of quantifying antitrust damages are the "before and after" and "yardstick" measures of lost profits,[17] a plaintiff may prove damages by a different measure tailored to the facts of the case, so long as the estimates and assumptions used rest on adequate data. See Lehrman v. Gulf Oil Corp., 500 F.2d 659, 668 (5th Cir. 1974) (hereinafter, "Lehrman II").

---

[17]    This court has defined the two methods as follows:

The before and after theory compares the plaintiff's profit record prior to the violation with that subsequent to it. The before and after theory is not easily adaptable to a plaintiff who is driven out of business before he is able to compile an earnings record sufficient to allow estimation of lost profits. Therefore, the yardstick test is sometimes employed. It consists of a study of the profits of business operations that are closely comparable to the plaintiff's. Although allowances can be made for differences between the firms, the business used as a standard must be as nearly identical to the plaintiff's as possible.

Lehrman v. Gulf Oil Corp., 500 F.2d 659, 667 (5th Cir. 1974).

20

This opinion will not dwell on whether the "fact" of antitrust injury has been proved, because PBSC's evidence of actual injury impermissibly consists of estimates based on assumptions that are based on estimates and assumptions. PBSC never made a profit during the five and one-half years it was open before the unsanctioned play rule was invoked by the defendants. It was allowed to put before the jury, however, a damage estimate that ignored the arena's past track record entirely by projecting a net operating margin of 8.6% for two years, 17.7% for a third year, and 20% for each of the following seven years of hypothetical revenues. PBSC's brief explains its novel calculations as "evidence of lost net income, based upon cash flow projections," urging that because Tom Higginson did not utilize customary measures of profitability in running his arenas, neither should the courts.

At least two elements of the damage proof cannot be reconciled with even the lenient standard approved by antitrust law.[18] First, the jury was instructed to find lost profits, not lost net income, yet the arena's evidence was based only on the latter concept. Second, even if PBSC's calculations were based on future lost profit, the "yardstick" measure of rates of return

---

[18] Lost profits is a measure of proof recognized by Texas courts for tortious interference claims. Under state law, such damages must be proved with reasonable particularity. See Kevin S. Marshall & Kurt J. Beron, Statistics & the Law: Proving Lost Profits, 2 Texas Wesleyan L.R. 467, 468 (1996) (hereinafter, "Beron"). Because the Texas standard appears to be more demanding than the antitrust standard, it follows that PBSC's proof would be inadequate to support the state law portion of the verdict.

21

employed by the plaintiff's economist was too speculative to support a verdict. These conclusions warrant further discussion.

As Higginson explained it, he computed the success of his indoor arenas by a hand-to-mouth technique. He considered an arena successful if it generated sufficient net revenue to pay current operating expenses each year and yielded enough extra to pay down debt acquired when the arena was purchased. He did not include depreciation in his calculation of net revenue, because he felt it was "not real." PBSC, however, did not perform even according to this optimistic strategy. It did not pay payroll and property taxes timely and only rarely reimbursed Higginson for his firm's services. It never generated extra revenue to pay down the acquisition cost of the real estate. Instead, Higginson's investor group continued contributing funds to cover that cost. In effect, Higginson kept the property open by borrowing from himself and his investors, but the evidence does not indicate that they ever received a return on their loans or investment.[19]

Consistent with Higginson's view of his business's welfare, PBSC took the position at trial that evidence of lost net revenue was a valid measure of damages. Lost net revenue was computed as the excess of revenue over current operating expenses with no deduction for depreciation. PBSC's economist acknowledged

---

[19] The long-term debt owed by the facility to Higginson's group and 84 Lumber increased from $183,000 in 1990 to $231,000 in the last full year of operation.

22

that lost net revenue is different from lost profits. According to PBSC, since generally accepted accounting principles (GAAP) do not have to be maintained by a small, privately held business, any old measure of "profit" will do.

This reasoning is unconvincing. It is inconsistent with, and the proof is therefore insufficient pursuant to, the court's definition of profits. "Profits" was defined in the jury instructions as "gain which is in excess of all expenses, costs, depreciation and other operating expenses and the like." PBSC has not challenged on appeal this instruction, which accords with the conventional understanding of profit. PBSC's computations, however, excluded depreciation entirely (although the firm's income statements consistently reflected depreciation charges). If depreciation charges are added to PBSC's costs, as the court's instruction required, PBSC never made a profit in five full years of operation. Moreover, its lack of profitability is accentuated by PBSC's failure to pay local property taxes when due. Under the court's definition, then, PBSC never made a profit before the enforcement of the unsanctioned play rule. Lost future profits could hardly be demonstrated by an entity that never made profits to lose.[20]

---

[20] Compare Beron, supra note 18, at 471-72 (evidence that a plaintiff's business lost money from the very beginning, never turned a profit or never got out of red ink will preclude recovery of lost profits in Texas law) (citations omitted).

23

Even if we were to accept lost net revenue as a measure of damages, however, the projections by PBSC's economist Dr. Beron are not based on a satisfactory "yardstick" of performance by "closely comparable" businesses. See Lehrman II, 500 F.2d at 667. Dr. Beron applied average rates of return (more precisely, rates based on net revenues over current expenses) derived from the experience at Higginson's other indoor arenas around the country. The purpose of averaging, the economist said, was to gauge PBSC's future performance by the blended performance of Higginson's more- and less-profitable facilities. One analytical problem and failure of this proof lies in the fact that an average of unknowns is also an unknown. An antitrust plaintiff who uses a yardstick method of determining lost profit bears the burden to demonstrate the reasonable similarity of the business whose earning experience he would borrow. See, e.g., Lehrman II, 500 f.2d at 667. Here, the only evidence of comparability was that Higginson owned the other indoor soccer arenas. No evidence was offered of the geographical location, size or attractiveness of those facilities, the size and type of the soccer player market that they served, the relative costs of operation, the amounts charged per team, or the number of seasons run. To apply those arenas' average "rates of return" indiscriminately to PBSC is like arguing that because McDonald's franchises earn a certain average rate of return, a particular franchise will perform to the average. Neither the yardstick arenas' rates of return nor their average was shown to be "as

24

nearly identical to (PBSC) as possible." Lehrman II, 500 F.2d at 667.

The yardstick measure was also unsupported in light of the record of PBSC's consistently negative cash flows. The trial exhibits based on PBSC records show that "true cash flow" measured by PBSC's method (i.e., excluding any charge for depreciation) was "even" in two of its five full years of operation, about 10% and 6% in the next two years and substantially negative in the first eight months of 1995. These figures are a far cry from the estimates of years of 20% net cash flow accepted as a yardstick by Dr. Beron. Damage assumptions that find no support in the actual facts of the case cannot support a verdict. See Metrix Warehouse, Inc. v. Daimler-Benz Aktiengesellschaft, 828 F.2d 1033, 1043 (4th Cir. 1987); Keener v. Sizzler Family Steak Houses, 597 F.2d 453, 456 (5th Cir. 1979) (a "verdict for damages may not be based on speculation and guesswork").[21]

To shore up the flaws in its proof, PBSC takes refuge in the lenient standard for quantifying antitrust damages and its underlying policy, which is to assure that anticompetitive conduct does not go unpunished for mere uncertainty in the amount of loss inflicted. But the lenient standard does not allow a plaintiff to

---

[21] Perhaps the projections of PBSC's lost net revenue were to be increased based on Higginson's testimony that he planned to move to flex scheduling and thus add more seasons of adult play. If so, however, Dr. Beron's estimates do not account for this change in any way, as the estimated "profit" margins and lost "profits" are based solely on the experience of other indoor arenas, which was not shown to be comparable.

mask its consistent lack of business success by using arbitrary measures of loss and counterfactual estimates of future "rates of return". The lenient standard does not permit the affirmance of a verdict on evidence that does not satisfy the court's instructions. Moreover, insofar as the purpose of the antitrust laws is to protect competition rather than competitors, competition in a market is not eroded when an entity fails that could not really compete because of its financial instability.

## V.  CONCLUSION

For the foregoing reasons, the damage judgment in favor of PBSC is REVERSED; the injunction order, not having been appealed, is unaffected by this reversal.

**AFFIRMED in part, REVERSED in part**.

26