# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-1657

_____

| | | |
|---|---|---|
| Gail Brookins, doing business as Ernie | * | |
| Glide Transmissions; Ernie Brookins, | * | |
| | * | |
| Plaintiffs - Appellants, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Northern District of Iowa. |
| International Motor Contest Association; | * | |
| Kathy Root; Billy Joe Bushore, doing | * | |
| business as Bushore Racing Enterprises, | * | |
| | * | |
| Defendants - Appellees. | * | |

_____

Submitted:  January 12, 2000

Filed:  August 3, 2000

_____

Before BOWMAN, FLOYD R. GIBSON,[1] and LOKEN, Circuit Judges.

_____

LOKEN, Circuit Judge.

Gail and Ernie Brookins commenced this action against the International Motor Contest Association ("IMCA"); its president, Kathy Root; and Billy Joe Bushore, a

---

[1]Complications from an automobile accident have prevented Judge Gibson from reviewing this opinion prior to its being filed.  The opinion is consistent with Judge Gibson's vote at conference.

competitor of the Brookins. The dispute arose when IMCA amended its rules governing IMCA-sanctioned "modified class" auto races in a way that, at least for a time, barred the use in those races of two transmissions manufactured by the Brookins. The Brookins appeal the grant of summary judgment dismissing their antitrust conspiracy claim for failure to prove either market power in a relevant market or actual detrimental effect on competition. We affirm.

## I.

Organized in 1915, IMCA is the oldest auto racing sanctioning body in the United States. IMCA franchises over 225 independent racing tracks in twenty-nine States and offers a variety of advertising and merchandising programs to companies that sponsor auto sport events. IMCA operates five racing divisions: modified, late model, sprint car, stock car, and hobby stock car. IMCA created the modified car class in 1979 to provide amateur auto racers an affordable but exciting racing opportunity. The concept proved extremely popular, and in 1997 nearly 4,000 drivers participated in IMCA-sanctioned modified races. For each racing class, IMCA promulgates uniform nationwide rules to provide, in the words of an IMCA brochure, "consistency and exciting competition from region to region." Specific car rules for each racing class are established by the IMCA executive committee.

In 1993, the Brookins introduced the "Ernie Glide" automatic transmission. It gained increasing use in IMCA modified races, and a car using an Ernie Glide transmission won the 1994 national championship race. Because of its novel design, many drivers and at least two competing transmission manufacturers (including defendant Bushore) questioned whether the Ernie Glide complied with IMCA's rule governing modified car transmissions. Prior to the 1995 racing season, IMCA officials concluded that the Ernie Glide met the letter but not the intent of the existing rule. IMCA's executive committee then revised the rule to require that all automatic transmissions have a functioning pump, a change that immediately affected only the

Ernie Glide. In 1995 and 1996, the Brookins modified the Ernie Glide to include a functioning pump and developed a new "Ernie Slide" standard transmission. After IMCA's Director of Competition informally assured the Brookins that their transmissions complied with the amended modified car rule, and after the Brookins marketed the transmissions in reliance on those assurances, IMCA's executive committee responded with further transmission rule changes and interpretations rather obviously aimed at barring the use of Ernie Glide and Ernie Slide transmissions at IMCA-sanctioned modified car races.

The Brookins commenced this action in mid-1996 when IMCA issued an adverse last-minute pre-season interpretation of its latest transmission rule. The Brookins alleged that defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1, when IMCA changed its rules in response to pressure from rival transmission manufacturers who were also IMCA sponsors. The district court[2] granted a preliminary injunction allowing drivers to continue using Ernie Slide transmissions for a reasonable period. Following substantial discovery, the district court granted summary judgment dismissing the Brookins' antitrust claim, but denied summary judgment on their state law claim of intentional interference with prospective business advantage. That tort claim went to trial against defendant IMCA. The jury awarded the Brookins $109,000 in compensatory damages, finding that IMCA had improperly interfered with the Brookins' relationships with potential transmission buyers by creating and unfairly interpreting rules with the intent of harming the Brookins' business. IMCA does not appeal that verdict, but the Brookins appeal the dismissal of their antitrust claim. We review the grant of summary judgment *de novo*, viewing the record in the light most favorable to the Brookins. See Minnesota Ass'n of Nurse Anesthetists v. Unity Hosp., 208 F.3d 655, 659 (8th Cir. 2000).

---

[2]The HONORABLE MICHAEL J. MELLOY, United States District Judge for the Northern District of Iowa.

## II.

The Brookins contend that IMCA's adverse rule changes were the product of concerted action by IMCA and competing transmission manufacturers that unreasonably restrained trade in modified car transmissions.[3] To prevail on this Section 1 claim, the Brookins must prove that defendants' concerted action injured competition. Injury to competition requires proof either of market power in a relevant market, or of an actual adverse effect on competition. See FTC v. Indiana Fed'n of Dentists, 476 U.S. 447, 460-61 (1986). The district court concluded the Brookins failed to make the required threshold showing of injury to competition. Noting undisputed evidence that there are many racing classes and many competing auto racing sanctioning bodies, such as NASCAR, CART, and USAC, the court concluded that the Brookins had failed to offer evidence showing that IMCA has market power in the relevant racing market, defined in defendants' motion for summary judgment as the "oval track racing transmission market." The court also concluded there was no evidence that excluding the Ernie Glide and Ernie Slide transmissions from modified car races has had an actual adverse effect on competition in that market.

On appeal, the Brookins challenge both those conclusions. Their primary contention is that no proof of market power is needed under the "unique" antitrust analysis that applies when a private organization sets product standards that exclude certain producers or deprive consumers of a desired product. Citing cases such as

---

[3]The Brookins do not contend that defendants' conduct amounted to a *per se* unlawful group boycott, and properly so. "[P]recedent limits the *per se* rule in the boycott context to cases involving horizontal agreements among direct competitors." NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 135 (1998). The Brookins offered evidence that two competing transmission manufacturers, defendant Bushore Racing Enterprises and non-defendant TCI, each complained to IMCA that the Ernie Glide and the Ernie Slide transmissions did not comply with IMCA's modified car rules. But there is no evidence that Bushore and TCI colluded with each other.

Indiana Federation of Dentists and Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492 (1988), the Brookins argue that exclusion of the Ernie Glide and Ernie Slide transmissions from modified car races governed by the IMCA rules had an actual adverse effect on competition by depriving modified race car drivers of less expensive, safer, better-performing products. Alternatively, attempting to redefine the relevant market on appeal, the Brookins argue they presented sufficient evidence that IMCA has market power in the market for "IMCA-approved transmissions for modified racing."

The Brookins' analysis is flawed because IMCA is not a typical standard-setting organization. Its rules do not tell transmission manufacturers or drivers what types of products or services they may sell or use in an open market. Rather, the IMCA modified car rules help define a game or sport in which the end product is a form of competition among race car drivers. If the game as defined is exciting for participants and spectators, it will prosper in relation to other games with which it competes in the broad recreational marketplace. As the Supreme Court said in describing college football in NCAA v. Board of Regents, 468 U.S. 85, 101-02 (1984):

> What the NCAA and its member institutions market in this case is competition itself -- contests between competing institutions. Of course, this would be completely ineffective if there were no rules on which the competitors agreed to create and define the competition to be marketed. A myriad of rules affecting such matters as the size of the field, the number of players on a team, and the extent to which physical violence is to be encouraged or proscribed, all must be agreed upon, and all restrain the manner in which institutions compete. . . . Thus, the NCAA plays a vital role in enabling college football to preserve its character, and as a result enables a product to be marketed which might otherwise be unavailable.

Without question, the way IMCA defines the rules for modified car racing will exclude some types of equipment. But the exclusion is an incidental and inevitable by-product of defining the game. A rule making body's impact on equipment

manufacturers will vary depending on the popularity of the game, and the extent to which its rules are followed by the game's players -- in other words, the extent to which they are seen as the rules of the game itself, rather than the rules of that body's league of game-players. For example, major league baseball's decision not to approve the use of metal bats has probably had only a modest exclusionary impact, because metal bats have become extraordinarily popular with millions of amateur baseball players who are not bound by major-league rules. On the other hand, when the United States Golf Association refuses to sanction a "revolutionary" golf ball guaranteed to fly 20% farther, the exclusionary impact is probably severe, because most amateur golfers want to play the game under uniform nationally-sanctioned rules.

For these reasons, the few courts to consider antitrust challenges to rules defining a sports activity have given the rule-makers considerable discretion to achieve their sporting objectives, "[a]t least, in the absence of any demonstrated significant market foreclosure." M & H Tire Co. v. Hoosier Racing Tire Corp., 733 F.3d 973, 987 (1st Cir. 1984) (upholding rule prescribing use of particular supplier's racing tire for modified car races); see Gunter Harz Sports, Inc. v. United States Tennis Ass'n, Inc., 511 F. Supp. 1103 (D. Neb.), aff'd per curiam, 665 F.2d 222 (8th Cir. 1981) (upholding ban on use of double-strung tennis rackets). The Brookins argue they need not undertake this market analysis because they presented proof of an actual adverse effect on competition -- precluding race car drivers from using a cheaper, safer, easier-to-maintain transmission. But unless the rule-maker's decision was tainted by supplier coercion, an issue we will address in a moment, the exclusion was the incidental result of defining the rules of a particular game, IMCA modified car racing. IMCA did not attempt to tell race car drivers not to use the Ernie Glide or the Ernie Slide in other types of racing. And if modified car drivers become convinced that the Brookins' transmissions are cheaper, safer, and easier to maintain, IMCA will need to reinterpret or change its modified car rules to allow use of the Ernie Glide and the Ernie Slide, or the drivers will gravitate to the races of other modified car sanctioning bodies, or to other classes of racing. In these circumstances, IMCA rules are not the kind of "naked

restraint" on competition that justify foregoing the market analysis normally required in Section 1 rule-of-reason cases. See generally California Dental Ass'n v. FTC, 526 U.S. 756 (1999).

Absent proof of an actual adverse effect on competition, the district court properly required the Brookins to define the relevant market and offer proof that IMCA has market power in that market. In the district court, the Brookins accepted the broad relevant product market defined by defendants -- transmissions for all oval track racing -- but offered no evidence as to what share of that market consists of modified car races governed by the IMCA modified car rules. On appeal, the Brookins urge a narrower product market -- transmissions used in modified car racing sanctioned by IMCA. In other words, the Brookins now argue that IMCA-sanctioned modified car racing is, by itself, a relevant market. But that assertion requires proof there is no cross-elasticity of demand between this game and other games that modified car racers might choose to play. See, e.g., Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962). Given the evidence of many other classes of auto racing, and many other auto racing sanctioning bodies, on this record no reasonable jury could find that races governed by the IMCA modified car rules are a separate relevant market for antitrust purposes.

Finally, we turn to a distinct antitrust issue, the Brookins' allegations that IMCA colluded with rival transmission manufacturers, Bushore and TCI. So long as IMCA made game-defining rules decisions based upon its purposes as a sports organization, an antitrust court need not be concerned with the rationality or fairness of those decisions. Irrational decisions and unfair treatment of suppliers will result in an unpopular game, and players and spectators will take their entertainment dollars elsewhere. But if the rules decisions are corrupted by coercion from competitors of the disadvantaged supplier, we have a different antitrust setting, one very similar to American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp., 456 U.S. 556 (1982), in which the Supreme Court upheld a jury verdict for a competitor injured by a product standard tainted in this fashion.

In this case, the purpose of the IMCA's modified car rules was summarized by the organization's President, Kathy Root, in her deposition testimony:

> Racing has a history of developing a class of race cars; technology takes over; the cars become obsolete because there's only a selected few people that can afford to have that car anymore.
>
> When Keith [her predecessor] started the IMCA Modified Division, his goal was to keep it as close to the 1979 rules as possible and to keep technology out of racing. Okay? So if a new, supposedly, quote, better part came along . . . the biggest concern is something to come along to make the other parts obsolete, forcing 4,000 race drivers to throw away the equipment that they had and buy more. And that has been our constant concern is to keep the technology out of racing. That's why we are concerned with people who try to circumvent the rules and introduce this new technology.

The Brookins simply failed to present probative evidence that Bushore or TCI coerced the IMCA rulings in question, or that IMCA's decisions were made for reasons other than those explained by Ms. Root. To be sure, Bushore and TCI -- as well as many drivers -- raised with IMCA the question whether the novel Ernie Glide and Ernie Slide transmissions were consistent with IMCA's modified car rules. But it is to be expected that contestants and competing suppliers will complain, or at least question, whether a new technology complies with "the rules of the game." This type of complaint is not proof that IMCA's rulings were the product of collusive rather than independent action. See Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 762-64 (1984). It is also unsurprising that IMCA, when faced with a new transmission technology, consulted other transmission manufacturers, as well as the Brookins, in investigating the rule compliance issue. There is no evidence that IMCA had a financial incentive to accede to the wishes of the Brookins' transmission competitors -- sponsors of IMCA-sanctioned events pay only modest fees to IMCA and spend most of their money on advertising and driver prizes. There is no evidence that IMCA's rulings were made for

reasons other than its overall purpose to define a set of rules for a popular game. Thus, the Brookins failed to present sufficient evidence of concerted action in restraint of trade. See Corner Pocket of Sioux Falls, Inc. v. Video Lottery Techs., Inc., 123 F.3d 1107, 111-12 (8th Cir. 1997), cert. denied, 522 U.S. 1117 (1998).

On this record, the district court's summary judgment rulings correctly perceived the difference between conduct that injures competition generally, which is the concern of the antitrust laws, and conduct that may violate other state laws which "provide remedies for various competitive practices thought to be offensive to proper standards of business morality." NYNEX, 525 U.S. at 137 (quotation omitted). The Brookins failed to present evidence of injury to competition, and their antitrust claim was therefore dismissed. The jury found and remedied a violation of state law arising out of the unfair manner in which IMCA amended and implemented its modified car transmission rule. The judgment of the district court is affirmed.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.