[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUG 2, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-13255

_____

D. C. Docket No. 02–01585-CV-T-24-MAP

JES PROPERTIES, INC.,
a Florida corporation,
d.b.a. Cypress Trails Farm,
MICHAEL W. GALLAGHER,

Plaintiffs-Appellants,

versus

USA EQUESTRIAN, INC.,
f.k.a. American Horse Show Assoc., et al.,
DAVE BURTON,
a.k.a. Dave Burton, Sr.,
a.k.a. Dave E. Burton,
a.k.a. Dave E. Burton, Sr.,
BURTON & SONS, INC.,
LITTLEWOOD FENCES, INC.,
DAVID BURTON,
a.k.a. David Burton, Jr.,
a.k.a. David E. Burton,
a.k.a. David E. Burton, Jr.,
UNITED STATES EQUESTRIAN FEDERATION, INC.,
STADIUM JUMPING, INC., EUGENE R. MISCHE et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

**(August 2, 2006)**

Before EDMONDSON, Chief Judge BIRCH and ALARCÓN,[*] Circuit Judges.

ALARCON, Circuit Judge:

JES Properties, Inc. ("JES") and Michael W. Gallagher appeal from the District Court's entry of summary judgment in favor of United States Equestrian Federation ("USEF"); Thomas E. Struzzieri, Horse Shows in the Sun, Inc., and Rose View Stables, Ltd (collectively, "HITS"); Eugene R. Mische and Stadium Jumping, Inc. (collectively, "SJI"); and David E. Burton, Sr. David E. Burton, Jr., Burton and Sons, Inc., and Littlewood Fences, Inc. (collectively, the "Burtons") (HITS, SJI and the Burtons are referred to collectively as the "Promoter Defendants"). The District Court concluded that JES and Mr. Gallagher had failed to raise a triable issue of fact regarding their claim that the USEF and the Promoter Defendants violated Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. We affirm.

_____

[*]Honorable Arthur L. Alarcón, United States Circuit Judge for the Ninth Circuit, sitting by designation.

2

# I

Since 1917, the United States Equestrian Federation ("USEF") and its predecessor the USA Equestrian, Inc. ("USAE") have governed the sport of amateur equestrianism in the United States. The rules that govern all American equestrian competitions were promulgated originally by the USAE. In June 2004, the United States Olympic Committee ("USOC"), pursuant to the Ted Stevens Olympic and Amateur Sports Act, 36 U.S.C. § 220501 *et seq*. ("ASA"), officially appointed the USEF as the sole national governing body for the sport ("NGB"). When appointed as the NGB, the USEF's Board of Directors adopted the same rules promoted by USAE, but with some changes effective in 2006.

The USEF consists of private individuals such as professional and amateur rider-athletes, trainers, judges, horse owners and officials; non-profit amateur sports organizations such as the North Florida Hunter and Jumper Association, Inc.; and promoters who profit financially by holding equestrian competitions. The USEF maintains a fifty-four member Board of Directors to promulgate the rules of the sport. The Board of Directors of the USEF contains ten members of the hunter/jumper community and no less than twenty percent of the voting power is allocated to "active equestrian athletes." An "active athlete" is one who is

engaged in equestrian competition or has represented the United States at an amateur international competition within the past ten years.

The NGB rules sanction certain equestrian competitions called "recognized competitions," which provide particular benefits to riders and promoters. Recognized competitions allow riders to collect points from wins. Wins lead to invitations to more prestigious competitions. In addition, recognized competitions award a total prize money amount of $10,000 or more for the "jumper" section of the competition.

Recognized competitions that are considered "A" or "AA-rated" are the highest rated competitions. They award the most points and in theory attract the best riders. In order to represent the United States at an international level, including the Olympic Games, athletes must compete in USEF-sanctioned competitions and typically excel in the A or AA-rated competitions.

All recognized competitions are subject to General Rule 214.7 ("Mileage Rule"), which was promulgated in 1975 by USAE (known at that time as the American Horse Shows Association) and adopted by the USEF.[1] The Mileage

---

[1]The Mileage Rule provides:

> New competitions offering "A" rated hunter or jumper divisions or sections will not be recognized on dates conflicting with those of any other Recognized Competition within the applicable distance specified by this rule which offers A rated hunter or jumper divisions or sections, regardless of class scheduling. . . . The mileage restrictions . . . will not prevent two

4

Rule requires that any A-rated recognized competitions held on the same date must be held at least 250 miles away from each other. This is true for all but some Northeastern states, which are subject to a 125-mile radius distance for A-rated competitions. The required distance diminishes as the rating decreases. Unrated or local competitions on the same date can be held within fifty miles of each other.

Under the Mileage Rule, an A-rated competition that was held on a certain date in the previous year receives priority. A promoter may nevertheless obtain USEF recognition if all "affected competition managements" agree in writing to permit the additional recognized competition. This written agreement is referred to as a "waiver." Stricter still for hunter/jumper competitions, the USEF requires a waiver for each year and an additional competition can never be closer than ten miles from an established one. However, a promoter may hold an A-rated competition elsewhere or on a different date without obtaining a waiver. Similarly, a promoter may hold B- or C- level competitions. The purpose of the Mileage Rule appears to be twofold. First, it aims to concentrate elite riders into fewer competitions in order to yield the most competitive international equestrian

---

Hunter/Jumper competitions from being approved if the two competitions have different competition managements and the competition with priority gives written permission, to be renewed annually, and the mileage distance between competitions is at least 10 miles.

team possible. Second, the rule intends to promote equestrianism nationwide by forcing promoters to hold recognized competitions in more diverse locations.

JES and Mr. Gallagher are among those USEF members who gain financially from promoting equestrian competitions. The Promoter Defendants also hold competitions for profit. JES, Mr. Gallagher, and the Promoter Defendants have conducted USEF sanctioned competitions throughout the state of Florida. JES, Mr. Gallagher, HITS, and the Burtons have also held unrecognized competitions in Florida.

In Florida, the weather is desirable for equestrian competition in the winter months, December through March. Because of the weather, the most lucrative and profitable winter season competitions occur in Florida. For the winter seasons of 2003-2004, 2004-2005, and 2005-2006, the Promoter Defendants planned every weekend to hold A-rated competitions in Florida. The Promoter Defendants secured these dates and facilities in Florida before JES and Mr. Gallagher. Due to the Mileage Rule, JES and Mr. Gallagher were unable to secure a date between December and March on which to hold A or AA-rated competitions in Florida. As provided by the rule, JES and Mr. Gallagher requested waivers from the "affected competition managements," the Promoter Defendants. The Promoter Defendants denied JES's and Mr. Gallagher's requests for waivers.

6

In 1982, HITS and SJI granted each other waivers that have been renewed each subsequent year. The reciprocal agreement permitted each promoter to hold USEF sanctioned A-rated competitions within the 250 mile restriction.

JES and Mr. Gallagher filed a complaint challenging the Mileage Rule as a violation of the Sherman Antitrust Act. They also alleged that the Promoter Defendants committed antitrust violations by granting each other waivers while refusing to grant waivers to JES and Mr. Gallagher. The District Court entered summary judgment in favor of the USEF and the Promoter Defendants. It concluded that (1) each defendant was entitled to implied immunity from antitrust liability; (2) JES and Mr. Gallagher lacked antitrust standing; (3) JES and Mr. Gallagher failed to present evidence of concerted action; and (4) the Rule of Reason applied to the USEF's and the Promoter Defendants' actions, and their actions were not an unreasonable restraint of trade. JES and Mr. Gallagher timely appeal each of those conclusions. We conclude that the USEF and the Promoter Defendants are entitled to implied immunity. We address standing briefly, but we do not reach the other issues raised by JES and Mr. Gallagher.

JES and Mr. Gallagher argue that the District Court erred in its determination that they lacked antitrust standing. Whether a plaintiff has standing to prosecute an antitrust claim is a question of law. *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448 (11th Cir. 1991). "Standing in an antitrust case involves more than the 'case or controversy' requirement that drives constitutional standing." *Id.* (citing *Flast v. Cohen*, 392 U.S. 83, 94-101 (1968)). Rather, antitrust standing "involves an analysis of prudential considerations aimed at preserving the effective enforcement of the antitrust laws." *Id.*

Because we conclude that the USEF and the Promoter Defendants are immune from antitrust liability, we need not determine whether JES and Mr. Gallagher have standing. *Levine v. Central Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1545 (11th Cir. 1996). In *Levine*, this Court noted:

> When a court concludes that no [antitrust] violation has occurred, it has no occasion to consider standing . . . . An increasing number of courts, unfortunately, deny standing when they really mean that no violation has occurred. In particular, the antitrust injury element of standing demands that the plaintiff's alleged injury result from the threat to competition that underlies the alleged violation. A court seeing no threat to competition in a rule-of-reason case may then deny

that the plaintiff has suffered antitrust injury and dismiss the suit for lack of standing. Such a ruling would be erroneous, for the absence of any threat to competition means that no violation has occurred and that even suit by the government–which enjoys automatic standing–must be dismissed.

*Id.* (quoting 2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 360f, at 202-03 (rev. ed. 1995) (footnotes omitted)). This Court has previously "ruled on the merits of an antitrust claim without ever deciding whether the plaintiff has antitrust standing." *Id.*

We see no difference between the example offered in *Levine*–a court seeing no threat to competition in a rule-of-reason case–and our conclusion in this case that the USEF and the Promoter Defendants are immune from antitrust liability because the ASA impliedly repeals the antitrust laws to the extent the USEF was acting pursuant to authority conveyed by the ASA. A defendant is entitled to implied immunity when its actions are necessary for the effective operation of a law enacted by Congress. *See infra*, Part IB; *Silver v. New York Stock Exch.*, 373 U.S. 341, 357 (1963). No party is able to establish an injury to competition under such circumstances because implied repeal of the antitrust laws represents a policy decision by Congress to tolerate that level of threat to competition. *See id.* at 359 (concluding that New York Stock Exchange regulation did not impliedly repeal

9

antitrust laws when, *inter alia*, it produced "competitive injury . . . when the imposition of such injury [was] not within the scope of the great purposes of the Securities Exchange Act."). We therefore turn to the merits of JES and Mr. Gallagher' antitrust claim.

**B**

JES and Mr. Gallagher next argue that the District Court erred in concluding that the ASA impliedly repeals the antitrust laws, thus giving the USEF and the Promoter Defendants immunity from antitrust liability. A district court's decision to grant summary judgment is reviewed *de novo*. *Holloman v. Mail-Well Corp.*, 443 F.3d 832, 836 (11th Cir. 2006). Summary judgment is appropriate if the moving party demonstrates that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.*

In *Silver*, the Supreme Court held that under certain circumstances, a defendant is immune from antitrust liability because his or her actions are permitted by overriding federal law. *Silver*, 373 U.S. at 357. "Repeal of the antitrust laws by implication is not favored and not casually to be allowed. Only where there is a 'plain repugnancy between the antitrust and regulatory provisions' will repeal be implied." *Gordon v. New York Stock Exch., Inc.*, 422 U.S. 659, 682 (1975) (quoting *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 350-51

10

(1963)). "Repeal is to be regarded as implied only if necessary to make [another federal law] work, and even then only to the minimum extent necessary. This is the guiding principle to reconciliation of . . . two statutory schemes." *Silver*, 373 U.S. at 357.

In this case, the USEF and the Promoter Defendants argue that the ASA impliedly repeals the antitrust laws. The ASA was enacted "to correct the disorganization and serious factional disputes that seemed to plague amateur sports in the United States." *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm'n*, 483 U.S. 522, 544 (1987) (citations and internal quotations omitted). Under the ASA, the United States Olympic Commission ("USOC") is authorized to recognize one national governing body ("NGB") for each sport included in the program of the Olympic games.

> The NBG must satisfy a number of requirements, including the ability to "demonstrate[] that it is autonomous in the governance of its sport, in that it independently determines and controls all matters central to such governance, does not delegate such determination and control, and is free from outside restraint.

*Behagen v. Amateur Basketball Ass'n of the United States*, 884 F.2d 524, 528 (10th Cir. 1989) (quoting 36 U.S.C. § 391(b)(4)).

The ASA provides:

11

(a) Authority—For the sport that it governs, a national governing body may—

(1) represent the United States in the appropriate international sport federation;

(2) establish national goals and encourage attainment of those goals;

(3) serve as the coordinating body for amateur athletic activity in the United States; . . .

(6) recommend to the [USOC] individuals and teams to represent the United States in the Olympic Games . . .

36 U.S.C. § 220523.

For the sport that it governs, a national governing body *shall*—

(1) develop interest and participation throughout the United States and be responsible to the persons and amateur sports organizations it represents;

(2) minimize, through coordination with other amateur sports organizations, conflicts in the scheduling of all practices and competitions[.]

36 U.S.C. § 220524 (emphasis added). "The [ASA] provides for ongoing review of the NGB by the USOC in order to ensure compliance with the [ASA]."

*Behagen*, 884 F.2d at 528.

The USEF is the NGB for equestrian sports in the United States. The USEF and the Promoter Defendants argue that the ASA confers on the USEF the authority to promulgate the Mileage Rule and that application of the antitrust laws to the enforcement of the Mileage Rules is plainly repugnant to that authority.

12

In *Behagen*, the Tenth Circuit considered whether the ASA impliedly repealed the antitrust laws. *Id.* In that case, Ronald Behagen, a basketball player, was deemed ineligible to play amateur basketball by the Amateur Basketball Association of the United States of America ("ABA/USA"), the NGB for basketball. *Id.* at 525-26. The ABA/USA had an eligibility rule that stated that once a player had played professionally, he or she could return to amateur basketball only once. *Id.* at 526. Mr. Behagen had played professionally, returned to amateur play, returned to professional play, and again sought to return to amateur play. *Id.* The ABA/USA, based on its eligibility rule, would not permit Mr. Behagen to play. *Id.*

Mr. Behagen alleged that the refusal to permit him to play constituted a violation of § 1 of the Sherman Antitrust Act. *Id.* at 527. Section 1 reads in relevant part, "Every contract, combination in form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. Mr. Behagen alleged that the refusal constituted an illegal group boycott. The jury agreed and awarded him treble damages. *Behagen*, 884 F.2d at 527.

The court held that

13

the antitrust issue should not have gone to the jury. The defendants' actions in this case were clearly within the scope of activity directed by Congress, and were necessary to implement Congress' intent with regard to the governance of amateur athletics. We therefore hold that the defendants' allegedly violative actions here are exempt from the coverage of the federal antitrust laws.

*Id.* The court reasoned that the ASA conferred "monolithic control" on the NGB to regulate "its particular amateur sport, including . . . controlling amateur eligibility for Americans to participate in that sport." *Id.* at 529. Although the ASA did not explicitly repeal the federal antitrust laws as they pertain to the actions of an NGB, "the directives of the [ASA made] the intent of Congress sufficiently clear." *Id.* Mr. Behagen complained of "exactly that action which the [ASA] directs—the monolithic control of an amateur sport by the NBG for that sport . . . ." *Id.*

The question whether the ASA impliedly repeals antitrust laws was again considered in *Eleven Line, Inc. v. North Texas State Soccer Ass'n, Inc.*, 213 F.3d 198 (5th Cir. 2000). In *Eleven Line*, the owner of an indoor soccer facility brought suit against the North Texas State Soccer Association ("NTSSA"), alleging it violated the antitrust laws in enacting a rule that forbade its members from playing at any non-NTSSA sanctioned facility. *Id.* at 199. The court concluded that the actions of the NTSSA were not immune from antitrust liability because it was the

14

state association, not the NGB, that promulgated the rule. *Id.* at 204. However, it concluded that *Behagen* was correctly decided. It explained,

> Although the facts of this case do not support an implied exemption from the antitrust laws, an implied exemption would be appropriate in many other situations. For example, if the national state associations all over the country had a similar rule, one could infer that the rule was necessary to the management of the sport.

*Id.*

As *Behagan* and *Eleven Line* demonstrate, when properly exercised, the "monolithic control" a NGB has over its particular support may excuse actions that would otherwise violate antitrust laws. Therefore, the question for this Court is whether the application of the antitrust laws to the facts of this case would "unduly interfere" with the "operation" of the ASA. *Gordon*, 422 U.S. at 686.

Congress has specifically required NGB's to minimize conflicts in the scheduling of competitions and to "develop interest and participation throughout the United States" in their particular sport. 36 U.S.C. § 220524. The Mileage Rule functions to minimize conflicts and encourages interest in equestrian sports. It forbids competitions of the same rating from being held on the same days within 250 miles of each other. The USEF and the Promoter Defendants adduced evidence that the rule enables the best athletes to compete against each other. If two competitions of the same rating were in close proximity, top athletes may

15

avoid competition against each other and go to different competitions. The USEF and the Promoter Defendants also produced evidence that the rule protects horses from being overworked. If two competitions were very close by on the same dates, horses may be taken from one competition to the next without sufficient rest. Additionally, the rule encourages the spread of equestrian sports throughout the country. If a competition cannot be held in one locality, a promoter may decide to hold a competition in a region in which competition has never been held. Therefore, the Mileage Rule is an exercise of the "monolithic control" Congress conferred on the USEF.

JES and Mr. Gallagher argue that the USEF and the Promoter Defendants should not enjoy implied immunity because the Mileage Rule is not "necessary" for the USEF to perform its functions under the ASA. They focus on language in *Behagen*: "defendants' actions in this case were clearly within the scope of activity directed by Congress, and were *necessary to implement Congress' intent with regard to the governance of amateur athletics*." *Behagen*, 884 F.2d at 527 (emphasis added). JES and Mr. Gallagher contend that if the USEF and equestrian sports can function without the Mileage Rule, the USEF and the Promoter Defendants are not entitled to immunity.

16

JES's and Mr. Gallagher's arguments regarding why the Mileage Rule is not necessary focus on whether the rule is an effective or wise way of implementing the power given the USEF to minimize conflicts in scheduling and develop interest in equestrian sports throughout the United States. They argue, in effect, that the rule is underinclusive because it can be waived in various circumstances. They argue that the rule is counterproductive because it impedes JES and Mr. Gallagher from entering the sport and competing with other promoters to enhance the quality of competitions. They also argue that because the rule was not promulgated until 1975, it must not be necessary (or else it would have been promulgated earlier). They argue that because in the Northeast, the required distance between competitions is only 125 miles, the 250-mile restriction must not be necessary.

JES's and Mr. Gallagher's reading of *Behagen* is inconsistent with Supreme Court authority. In *Gordon*, the Supreme Court considered a challenge to commission rates fixed by the New York Stock Exchange ("NYSE"). *Gordon*, 422 U.S. at 661-62. It concluded that the NYSE had immunity from antitrust liability because the power to fix commission rates was specifically conferred by the Securities Exchange Act. *Id.* at 668, 691. The United States, as amicus, argued that whether a defendant is entitled to implied immunity was a question of

17

fact to be decided after a trial on the merits. *Id.* at 686. The Court concluded that this argument "confused two questions." *Id.* at 688. The Court explained:

> On the one hand, there is a factual question as to whether fixed commission rates are actually necessary to the operation of the exchanges as contemplated under the Securities Exchange Act. On the other hand, there is a legal question as to whether allowance of an antitrust suit would conflict with the operation of the regulatory scheme which specifically authorized the SEC to oversee the fixing of commission rates. The factual question is not before us in this case. Rather, we are concerned with whether antitrust immunity, as a matter of law, must be implied in order to permit the Exchange Act to function as envisioned by Congress. The issue of the wisdom of fixed rates becomes relevant only when it is determined that there is no antitrust immunity.

*Id.*

Additionally, JES's and Mr. Gallagher's understanding of what makes a rule "necessary" according to *Behagen* is too restrictive. In *Behagen*, the court did not consider whether the *particular* eligibility rule was necessary or otherwise examine the wisdom of the rule. It simply concluded that promulgating eligibility rules was necessary in order for the NGB to carry out its role as defined by the ASA. *See generally Behagen*, 884 F.2d 524-30. Similarly, in *Eleven Line*, the court concluded that the NTSSA rule was not necessary. *Eleven Line*, 213 F.3d at 204-05. However, the court then listed a whole host of rationales that may have

18

justified the NTSSA rule. It did not delve into an analysis of whether the rule would be wise or indispensable under any of those circumstances. *Id.*

This Court will not substitute its own judgment for that of the USEF regarding the optimum way to fulfill its obligations. *Cf. Brookins v. Int'l Motor Contest Ass'n*, 219 F.3d 849, 853 (8th Cir. 2000) (stating that regarding antitrust challenges to rules defining professional sports activities, authorities have been given considerable discretion to achieve their sporting objectives, absent any demonstrated market foreclosure). If this Court were to apply the test that JES and Mr. Gallagher suggest–determining whether the Mileage Rule is necessary–it would threaten the national uniformity Congress envisioned in enacting the ASA. *San Francisco Arts & Athletics, Inc.*, 483 U.S. at 544 (discussing need for ASA to eliminate factions in amateur sports). This inability to engage in the analysis JES and Mr. Gallagher suggest without disrupting the ASA illustrates why implied immunity is called for in this case. The question before this Court is whether the application of antitrust laws to the actions of the USEF and the Promoter Defendants is "plainly repugnan[t]" to the ASA. *Gordon*, 422 U.S. at 682. Because the ASA requires an NGB to promulgate rules to minimize conflicts in schedules, the imposition of antitrust liability for the promulgation of such a rule is "plainly repugnan[t]" to the ASA.

19

JES and Mr. Gallagher also argue that this Court should apply a multi-factor test enunciated by the Second Circuit in *Billing v. Credit Suisse First Boston Ltd.*, 426 F.3d 130 (2d Cir. 2005) to the question whether the ASA impliedly repeals the antitrust laws. In *Billing*, the court held that when a "potential specific conflict" exists between a regulatory rule and antitrust laws courts

> will apply immunity if [they] determine that Congress contemplated the specific conflict and intended for the antitrust laws to be repealed. That determination is informed by considering (1) congressional intent as reflected in legislative history and a statute's structure; (2) the possibility for conflicting mandates; (3) the possibility that application of the antitrust laws would moot a regulatory provision; (4) the history of agency regulation of the anticompetitive conduct; and (5) any other evidence indicating that the statute implies a repeal.

*Id.* at 164-65.

JES's and Mr. Gallagher's arguments applying *Billing* in substance repeat the arguments pertaining to whether the Mileage Rule is necessary. They argue that the Mileage Rule, as a particular exercise of power by the USEF, is not what Congress had in mind when it enacted the ASA and granted NGB's authority. Regardless of whether *Billing* would require a more searching scrutiny of the Mileage Rule, this Court follows the more closely analogous holdings in *Behagen* and *Eleven Line*.

20

**AFFIRMED.**