**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

GOLD MEDAL LLC, DBA Run Gum,
*Plaintiff-Appellant*,

v.

USA TRACK & FIELD; UNITED
STATES OLYMPIC COMMITTEE,
*Defendants-Appellees.*

No. 16-35488

D.C. No.
6:16-cv-00092-
MC

OPINION

Appeal from the United States District Court
for the District of Oregon
Michael J. McShane, District Judge, Presiding

Argued and Submitted May 8, 2018
Portland, Oregon

Filed August 7, 2018

Before: Kim McLane Wardlaw[*], Johnnie B. Rawlinson,
and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Rawlinson;
Concurrence by Judge Nguyen

---

[*] Judge Kim McLane Wardlaw was drawn to replace Judge Marvin Garbis, who retired after oral argument but before this opinion was published. Judge Wardlaw has read the briefs, reviewed the record, and listened to oral argument.

## SUMMARY[**]

### Antitrust

The panel affirmed the district court's dismissal of a complaint alleging that USA Track & Field and the United States Olympics Committee engaged in an anticompetitive conspiracy in violation of antitrust law by imposing advertising restrictions during the Olympic Trials for track and field athletes.

Following the analysis of the Tenth and Eleventh Circuits, and distinguishing a decision of the Fifth Circuit, the panel held that the Olympics Committee and USATF were entitled to implied antitrust immunity on the basis that their advertising restrictions were integral to performance of their duties under the Ted Stevens Olympic and Amateur Sports Act.

Concurring in the result, Judge Nguyen disagreed with the majority's conclusion that the defendants were immune from the antitrust claim alleged in the complaint. Judge Nguyen wrote that the complaint nevertheless failed to state a claim under § 1 of the Sherman Act because, even if the plaintiff could allege a plausible conspiracy and a viable product market, it did not allege that the defendants received any economic benefit.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Sathya S. Gosselin (argued), Swathi Bojedla, and Michael D. Hausfeld, Hausfeld LLP, Washington, D.C.; Timothy P. Landis, Timothy Landis P.C., Portland, Oregon; for Plaintiff-Appellant.

Derek Ludwin (argued) and Philip J. Levitz, Covington & Burling LLP, Washington, D.C.; Bruce L. Campbell, Miller Nash Graham & Dunn LLP, Portland, Oregon; Douglas N. Masters and Emily Stone, Loeb & Loeb LLP, Chicago, Illinois; Nathan J. Muyskens, Loeb & Loeb LLP, Washington, D.C.; Robert E. Sabido, Cosgrave Vergeer Kester LLP, Portland, Oregon; for Defendants-Appellees.

**OPINION**

RAWLINSON, Circuit Judge:

Appellant Gold Medal LLC d/b/a Run Gum (Run Gum) appeals the district court's order dismissing its complaint. Run Gum alleged that Appellees USA Track & Field (USATF) and the United States Olympic Committee (Olympic Committee) engaged in an anticompetitive conspiracy in violation of antitrust law by imposing advertising restrictions during the Olympic Trials for track and field athletes. According to Run Gum, the district court erroneously determined that the Olympic Committee and USATF should be afforded implied antitrust immunity on the basis that their advertising restrictions were integral to performance of their duties under the Ted Stevens Olympic and Amateur Sports Act (ASA). *See JES Props., Inc. v. USA Equestrian, Inc.*, 458 F.3d 1224, 1226 (describing the ASA)

(Alarcon, C.J., authoring judge).  Reviewing *de novo*, we affirm the judgment of the district court.

## I.  BACKGROUND

This appeal involves the statutory framework devised by Congress in support of the mission of national sports governing bodies to promote and finance the participation of American athletes in "international amateur athletic competition." 36 U.S.C. § 220503.  Under the auspices of the ASA, the Olympic Committee exercises exclusive jurisdiction over "all matters pertaining to United States participation in the Olympic Games, the Paralympic Games, and the Pan-American Games, including representation of the United States in the games," and "the organization of the Olympic Games, the Paralympic Games, and the Pan-American Games when held in the United States."  *Id.* at § 220503(3).  With respect to amateur athletics, the Olympic Committee may "organize, finance, and control the representation of the United States in the competitions and events of the Olympic Games, the Paralympic Games, and the Pan-American Games."  *Id.* at § 220505(c)(3).  The Olympic Committee may also "obtain, directly or by delegation to the appropriate national governing body, amateur representation for those games." *Id.*

In its complaint, Run Gum, a manufacturer of "compressed functional chewing gum" containing "a proprietary mix of caffeine, taurine, and b vitamins," averred that USATF, as the national governing body for the sport of track and field, "organizes and hosts the Olympic Trials, where the greatest track [and] field athletes in the United States compete to earn a position on the U.S. Olympic team." Run Gum asserted that "[g]iven the unique nature and

infrequency of the Olympic Trials, the public interest is overwhelming," with "[i]n-person attendance typically exceed[ing] 20,000."

Run Gum alleged that, despite its interest in sponsoring athletes during the Olympic Trials, it was precluded from doing so due to logo and sponsorship restrictions imposed by the Olympic Committee and enforced by USATF. According to Run Gum, USATF "severely restrict[s] the type of *individual* sponsors that track [and] field athletes can display on their athletic apparel at the Olympic Trials, including their competition kit, which greatly diminishes sponsorship opportunities for the athletes and excludes various would-be sponsors." (internal quotation marks omitted) (emphasis in the original). Run Gum complained that USATF's advertising restrictions provide that "with the exception of standard manufacturers' equipment identification . . . the equipment, uniforms, and the bibs/numbers of the competitors and officials at the Trials may not bear any commercial identification or promotional material of any kind (whether commercial or noncommercial)." (alteration and footnote reference omitted). Run Gum asserted that the USATF regulation nonetheless allows athletes to wear apparel containing the logo and names of certain pre-approved manufacturers, such as Nike.

Run Gum maintained that use of pre-approved manufacturers "exclude[d] scores of sponsors from the marketplace" in violation of Section 1 of the Sherman Act. Run Gum posed a single cause of action premised on violations of the antitrust laws stemming from the challenged advertising restrictions. Run Gum contended that the regulation limiting sponsorships of athletes during the Olympic Trials was "an anticompetitive horizontal and

vertical agreement among competitors to fix artificially—and unlawfully—the number of individual sponsors and the price paid to athletes for individual sponsorship." Run Gum further alleged that the advertising and logo restriction was "an unlawful group boycott of individual sponsors that do not manufacturer [sic] apparel or equipment, which are categorically excluded from sponsoring athletes at the Olympic Trials." In addition to damages, Run Gum sought to enjoin the Olympic Committee and USATF from "preventing Run Gum from sponsoring individual athletes at the 2016 Olympic Trials in exchange for sponsor identification on clothing at the Olympic Trials."

In a published opinion, the district court dismissed Run Gum's action based on implied antitrust immunity under the ASA. *See Gold Medal LLC v. USA Track & Field*, 187 F. Supp. 3d 1219, 1222 (D. Or. 2016). While acknowledging that grants of implied antitrust immunity are generally disfavored, the district court nevertheless concluded that the advertising restrictions enabled the Olympic Committee and USATF to perform their statutory obligations under the ASA. *See id.* at 1228–30. The district court emphasized that "[a]s the only nation that does not provide its Olympic team with federal funding or subsidies, the United States instead relies on the [Olympic Committee] to raise the financial resources necessary to organize Team USA and to compete in the Olympic Games." *Id.* at 1228 (citation omitted). According to the district court, the advertising restrictions "prevent a dilution of the Olympic brand," and "permit the [Olympic Committee] and USATF to play a gatekeeping function which preserves the exclusivity–and thus value–of the Olympic symbols and name." *Id.* at 1230. Due to the importance of the advertising restrictions in advancing the Olympic mission, the district court held that the Olympic

Committee and USATF should be afforded implied antitrust immunity in enforcing the restrictions that were necessary to fulfillment of their statutory duties under the ASA. *See id.* at 1231–32.

Run Gum filed a timely notice of appeal.

## II. STANDARDS OF REVIEW

"We review de novo the district court's grant of a motion to dismiss." *Elmakhzoumi v. Sessions*, 883 F.3d 1170, 1172 (9th Cir. 2018) (citation omitted).

"We [also] review *de novo* . . . the district court's determinations of immunity from antitrust liability." *United Nat'l Maintenance, Inc. v. San Diego Convention Ctr., Inc.*, 766 F.3d 1002, 1006 (9th Cir. 2014) (citation omitted).

## III.    DISCUSSION

We have recognized that "implied antitrust immunity is not favored, and can be justified only by a convincing showing of clear repugnancy between the antitrust laws and the regulatory system." *Total TV v. Palmer Commc'ns, Inc.*, 69 F.3d 298, 302 n.6 (9th Cir. 1995) (citation and alteration omitted). Although we have not directly addressed implied antitrust immunity under the ASA, other circuit courts have found the requisite "clear repugnancy" between the ASA and antitrust laws. *Id.*

In *JES Props., Inc. v. USA Equestrian, Inc.*, 458 F.3d 1224 (11th Cir. 2006), the Eleventh Circuit addressed a rule developed by the United States Equestrian Foundation (Equestrian Foundation) that imposed a mileage distance for

equestrian competitions. *See id.* at 1226–27. The mileage rule generally required that any A-rated equestrian competitions on the same date be held a minimum of 250 miles apart. The Eleventh Circuit discerned the following two purposes for the rule: 1) "to concentrate elite riders into fewer competitions in order to yield the most competitive international equestrian team possible," and 2) "to promote equestrianism nationwide by forcing promoters to hold recognized competitions in more diverse locations." *Id.* at 1227. The Eleventh Circuit reasoned that, due to "the monolithic control"exercised by national governing bodies, "the question . . . is whether the application of the antitrust laws to the facts of this case would unduly interfere with the operation of the ASA." *Id.* at 1231–32 (citation and internal quotation marks omitted). The Eleventh Circuit explained that it would "not substitute its own judgment for that of the [Equestrian Foundation] regarding the optimum way to fulfill its obligations," and concluded that "implied immunity [was] called for in [the] case." *Id.* at 1232. In reaching this conclusion, the Eleventh Circuit emphasized that, contrary to the plaintiffs' assertions, it was not required to "focus on whether the rule is an effective or wise way of implementing [the Equestrian Foundation's] powers," *id.* at 1231, or to "consider whether the *particular* eligibility rule was necessary or otherwise examine the wisdom of the rule." *Id.* at 1232 (emphasis in the original). The Eleventh Circuit held that "[b]ecause the ASA requires [a national governing body] to promulgate rules to minimize conflicts in schedules, the imposition of antitrust liability for the promulgation of such a rule is plainly repugnant to the ASA." *Id.* (alteration and internal quotation marks omitted).

The Eleventh Circuit relied heavily on the Tenth Circuit's approach in *Behagen v. Amateur Basketball Ass'n of the*

*United States*, 884 F.2d 524 (10th Cir. 1989). *See JES Props.*, 458 F.3d at 1231–32. In *Behagen*, the Tenth Circuit reversed a jury verdict in favor of a basketball player who challenged under the antitrust laws an eligibility rule developed by the national governing body for amateur basketball that prohibited a player from participating in amateur events if the player had participated in professional games. *See Behagen*, 884 F.2d at 526–27. The Tenth Circuit held that the antitrust issue should not have gone to the jury because the eligibility rule was exempt from the antitrust laws under the ASA. *See id.* at 527. The Tenth Circuit emphasized that "Behagen complains of exactly that action which the [ASA] directs—the monolithic control of an amateur sport by the [national governing body] for that sport." *Id.* at 529. The Tenth Circuit clarified that "the [Amateur Basketball Association of the United States of America] could not be authorized under the [ASA] unless it maintained exactly that degree of control over its sport that Behagen here alleges as an antitrust violation." *Id.* The Tenth Circuit emphasized that "[a]lthough [a national governing body] is a private actor, the monolithic control exerted by [a national governing body] over its amateur sport is a direct result of the congressional intent expressed in the Amateur Sports Act." *Id.* at 528 (footnote reference omitted).

We are persuaded that we should follow the analysis reflected in the decisions of our sister circuits applying implied antitrust immunity under the ASA. We are not persuaded that the Fifth Circuit's decision in *Eleven Line, Inc. v. N. Tex. State Soccer Ass'n, Inc.*, 213 F.3d 198 (5th Cir. 2000), mandates a reversal in this case. In *Eleven Line*, the Fifth Circuit held that the exclusionary activities of non-profit, volunteer-run soccer organizations should not be afforded implied antitrust immunity. *See id.* at 199, 204–05.

The non-profit organization in that case promulgated and implemented a rule requiring soccer players, coaches, and referees to conduct soccer games only at "sanctioned" facilities, which did not include Eleven Line's for-profit soccer facility. *Id.* at 199. Notably, the national governing body for youth soccer did not issue the challenged rule or explicitly approve it. *See id.* at 204 & n.1. For these reasons, *Eleven Line* is distinguishable from the present appeal, as well as from *JES Properties* and *Behagen*, because it involved a rule that was not sanctioned or approved by a national governing body, and the organization imposing the rule was the "only national state association to have such a rule." *Id.*

The Fifth Circuit recognized the propriety of applying implied antitrust immunity under the ASA when the rule, like the advertising and logo restriction before us in this case, is either developed or approved by a national governing body:

> Although the facts of this case do not support an implied exemption from the antitrust laws, an implied exemption would be appropriate in many other situations. For example, if national state associations all over the country had a similar rule, one could infer that the rule was necessary to the management of the sport. . . . If [the national governing body] had promulgated the rule or expressly approved [the] rule in such a way as to indicate an awareness of its consequences, it would be a player eligibility rule exempted under *Behagen*. . . . Any of these circumstances, and no doubt others not described here, would merit an implied exemption.

*Id.* at 204–05.

The Fifth Circuit expressed its belief that "*Behagen* was correctly decided," but recognized that *Behagen* did not cover the facts of *Eleven Line*. *Id.* at 204. Ultimately, in *Eleven Line*, the Fifth Circuit concluded that implied antitrust immunity was unavailable because the non-profit soccer organization "promulgated a rule that could be found nowhere else in the country, that was not explicitly approved by the [the national governing body], and for which it was unable to articulate a convincing rationale related to its management of amateur soccer in the area." *Id.* at 205.

We conclude that the decisions of the Tenth and Eleventh Circuits provide a sound basis for affirming the district court's application of implied antitrust immunity to the advertising and logo restrictions enforced by the USATF. Under the ASA, the respective national governing body is authorized to "organize, finance, and control the representation of the United States in the competitions and events of the Olympic Games, the Paralympic Games, and the Pan-American Games, and obtain, directly or by delegation to the appropriate national governing body, amateur representation for those games." 36 U.S.C. § 220505(c)(3). The ASA broadly grants national governing bodies exclusive rights in "the name United States Olympic Committee," "the symbol of the International Olympic Committee," "the emblem of the corporation," as well as "the words Olympic, Olympiad, Citius Altius Fortius, Paralympic, Paralympiad, Pan-American, America Espirito Sport Fraternite, or any combination of those words." 36 U.S.C. § 220506(a) (internal quotation marks omitted). In light of the broad authority bestowed upon national governing bodies to fund the Olympic Mission, the challenged advertising and logo

restrictions precluding advertisers from impinging on this delegated authority falls within the mission to protect the value of corporate sponsorships and maximize sanctioned fundraising. To compel the Olympic Committee and USATF under the antitrust laws to permit any would-be advertiser to sponsor individual athletes without national governing body approval "would unduly interfere with the operation of the ASA." *JES Props.*, 458 F.3d at 1231–32 (citation and internal quotation marks omitted). Although the statute does not explicitly bestow antitrust immunity, the ASA establishes funding for the Olympic mission as a central responsibility of the Olympic Committee and its national governing bodies. *See San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 538–39 (1987) (recognizing that exclusive rights in the term "Olympics" "directly advances . . . governmental interests by supplying the [Olympic Committee] with the means to raise money to support the Olympics and encourages the [Olympic Committee's] activities by ensuring that it will receive the benefits of its efforts"); *see also Behagen*, 884 F.2d at 529 ("Although the Amateur Sports Act does not contain an explicit statement exempting action taken under its direction from the federal antitrust laws, we find that the directives of the Act make the intent of Congress sufficiently clear. . . .") (citation and footnote reference omitted).

The analysis of our sister circuits that we now adopt is consistent with the express purpose of the ASA. As noted by the United States Supreme Court, the ASA was "enacted to correct the disorganization and the serious factional disputes that seemed to plague amateur sports in the United States." *San Francisco Arts & Athletics*, 483 U.S. at 544 (quoting H.R. Rep. No. 95-1627, p. 9, U.S. Code Cong. & Admin. News 1978 p. 7482). As discussed, the Supreme Court has

clarified that it was the intent of Congress that the Olympic Committee be provided "with the means to raise money to support the Olympics," including the "commercial and promotional value derived from the panache associated with the Olympics." *Id.* at 532–33. Similarly to the plaintiff in *Behagen*, Run Gum "complains of exactly that action which the [ASA] directs—the monolithic control of an amateur sport by the [national governing body] for that sport," *Behagen*, 884 F.2d at 529, as a "direct result of the congressional intent expressed in the [ASA]." *Id.* at 528 (footnote reference omitted).

Finally, Run Gum contends that the district court engaged in improper fact-finding that the advertising and logo restrictions prevented dilution of the Olympic brand. Run Gum specifically maintains that the district court's factual findings contradicted its allegations that must be taken as true at the dismissal stage. However, the district court's analysis was not premised on any improper factual findings, as the district court merely made the obvious and common-sense observation that elimination of the advertising restrictions would dilute the Olympic brand. *See San Francisco Arts & Athletics*, 483 U.S. at 532–33; *see also Gold Medal*, 187 F. Supp. 3d at 1230 (noting that Run Gum sought "to capitalize on the unique nature of the Olympic Brand" and that the national governing body sought to "prevent a dilution of the Olympic Brand").[1]

---

[1] Because we conclude that the Olympic Committee and USATF should be afforded implied antitrust immunity, we do not reach the alternative argument raised by the Olympic Committee and USATF that Run Gum failed to sufficiently allege the requisite relevant market for antitrust injury.

## IV.    CONCLUSION

Consistent with the purpose of the ASA, and the analytical framework reflected in *Behagen* and *JES Properties*, we conclude that the advertising and logo restrictions applied by the Olympic Committee and USATF to sponsorship of individual athletes during the Olympic Trials should be afforded implied antitrust immunity under the ASA.  The district court properly applied implied antitrust immunity under the ASA in dismissing Run Gum's complaint based on the "convincing showing of clear repugnancy between the antitrust laws" and the provisions of the ASA to advance the Olympic Committee's mission to fund and administer Olympic events.  *Total TV*, 69 F.3d at 302 n.6 (citation omitted).    As the district court observed, an injunction preventing enforcement of the advertisement regulation "would open the floodgates" to potential advertisers, some of which might enhance the Olympic brand and some of which might devalue the Olympic brand.  *See Gold Medal LLC*, 187 F. Supp. 3d at 1230.  The regulation avoids placing the Olympic Committee in the unenviable position of having to face this conundrum in fulfilling its mission to finance American Olympic athletes.  We thus view the regulation as protected from antitrust challenge.  *See Behagen*, 884 F.2d at 529 (connecting implied antitrust immunity with Congressional intent for the ASA).  As made evident by the *Eleven Line* decision, application of implied antitrust immunity is not limitless.    However, we are persuaded that the facts of this case fall comfortably within the framework contemplated by Congress when it enacted the ASA.  *See San Francisco Arts & Athletics*, 483 U.S. at 538–39 (discussing Congressional intent to supply the Olympic Committee with "the means to raise money to

support the Olympics" and "ensuring that the [Olympic Committee] will receive the benefit of its efforts").

**AFFIRMED.**

---

NGUYEN, Circuit Judge, concurring in the result:

Respectfully, I disagree with the majority's conclusion that defendants are immune from the antitrust claim alleged in the complaint.  As the majority correctly recognizes, "[i]mplied antitrust immunity is not favored, and can be justified only by a convincing showing of clear repugnancy between the antitrust laws and the regulatory system." *United States v. Nat'l Ass'n of Sec. Dealers, Inc.*, 422 U.S. 694, 719 (1975).  We therefore don't analyze conflict between antitrust and other laws at a high level of generality. *See Silver v. N.Y. Stock Exch.*, 373 U.S. 341, 357 (1963) (rejecting approach in which an organization's "general power to adopt rules" renders "particular applications of such rules . . . outside the purview of the antitrust laws.").  "[T]he proper approach . . . is an analysis which reconciles the operation of both statutory schemes with one another rather than holding one completely ousted." *Id.* at 357.

The antitrust claim here involves a narrow exception allowing athletes to wear apparel with the manufacturer's logo notwithstanding a general rule prohibiting sponsorship and advertising on their clothes.  The purpose of this exception, according to defendants, is "to permit athletes to purchase and wear store-bought apparel they preferred and could afford."  It has nothing to do with defendants' statutory right "to exercise exclusive jurisdiction" over "all matters

pertaining to United States participation in the Olympic Games," 36 U.S.C. § 220503(3)(A), to "authorize contributors and suppliers of goods or services to use" Olympic marks, *id.* § 220506(b), or to otherwise "finance . . . the Olympic Games," *id.* § 220505(c)(3).

While the rule banning advertising on athletic apparel may serve a revenue-raising purpose by protecting the value of the Olympic brand, it is the exception—not the rule—at issue here.  Run Gum's allegations don't suggest that defendants profit from the exception.[1]  But neither do they establish a viable product market.  *See Hicks v. PGA Tour, Inc.*, No. 16-15370, slip op. at 25–30 (9th Cir. July 27, 2018). Therefore, while implied antitrust immunity does not apply, Run Gum nevertheless has failed to allege an antitrust claim.

Run Gum normally would be entitled to amend its pleadings, *see id.* at 31–32, but here any amendment would be futile.  Even if Run Gum can allege a plausible conspiracy and a viable product market, its antitrust claim is still untenable.  Either defendants received no economic benefit, in which case the apparel manufacturer exception is nonactionable, *see O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1065–66 (9th Cir. 2015), or they are exercising their statutory right to finance the Olympic Games with implied immunity from suit.

---

[1] The only entities alleged to profit from the exception are the apparel manufacturers, who compete for advertising space on athletes' apparel with fewer potential rivals, thus suppressing their advertising costs. While it is possible that defendants indirectly profit from the exception by conspiring with the apparel manufacturers, Run Gum's conclusory allegations do not plausibly show this or any other conspiracy. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569 (2007).

Therefore, I concur in the result affirming the district court's dismissal of Run Gum's complaint with prejudice.